IN RE WILL OF JAMES K. HOOK.

CARL PERKINS et al., Appellants, v. IDA MAY HAYES et al., Appellees.

**WILLS: Mental Capacity as Jury Question.** Evidence tending to
1   show that an aged testator had been seriously bedridden for
some two years prior to his death, and was in a stupor at the
time the alleged will was executed, together with other attend-
ing facts and circumstances, held to present a jury question
on the issue of testamentary capacity.

**WILLS: Testamentary Capacity—Unrecognized Expert Theory.** An
2   opinion that one is mentally unsound, based on the theory that
a sick person cannot be of sound mind, does not rise to the
dignity of expert medical testimony.

*Appeal from Mahaska District Court.*—K. E. WILLCOCKSON,
Judge.

JULY 6, 1920.

THIS is a will contest. At the close of all the evidence,
there was a directed verdict for the proponents. The con-
testants appeal.—*Reversed and remanded.*

*McCoy & McCoy* and *Reynolds & Heitsman,* for appel-
lants.

*Frank T. Nash* and *Burrell & Devitt,* for appellees.

EVANS, J.—The testator was James K. Hook, who died
resident in Mahaska County, December 2, 1917. The will
in controversy was executed on June 12, 1917. The de-

cedent's estate was of the value of about $50,000, comprising a farm and an interest in certain personal property thereon. He left surviving him his widow; his son Frank; his two daughters, Mrs. Hoit and Mrs. Hayes; and four grandchildren, being the infant children of his deceased daughter, Edith Perkins. Subject to a life estate granted to the widow, the will devised substantially all the property to the three surviving children, $500 being bequeathed to the Perkins children. The contest is made on behalf of these grandchildren by their guardian.

1. WILLS: mental capacity as jury question.

In view of the conclusion reached by us herein, which will remand the case for a new trial, we shall avoid, as much as possible, a discussion of the evidence in its entirety, and shall state our conclusion briefly, and with as little prejudice as possible to the future consideration of the evidence by a jury.

Without intimating any opinion as to the relative weight of the evidence as it is set out before us, we think the evidence on behalf of the contestants was sufficient to go to the jury. Such being the case, we cannot deal with the comparative weight of it, or with the impeaching features of the record.

Mr. Hook was a man of high standing in his community, and of undoubted business capacity. He died at the age of 67. He had been a great sufferer from articular rheumatism for 17 years. His joints had become deformed, and he had gradually become physically helpless. In June, 1916, he had been greatly affected by the death of his son Willis. One year later, he was likewise affected by the sudden death of his daughter Edith, the mother of these contestants, who died on May 31, 1917, leaving her husband surviving her, and the four small children. By a prior will made in September, 1916, equal provision had been made for the four living children of testator, except that the share of Edith was so put in trust as to prevent the control or use thereof by her husband.

For the last 22 months of his life, the testator had been

confined to his bed, in the constant care of some member of his family as nurse. During this time, the pain suffered by him was so severe that it could be controlled only by the constant use of morphine. The general contention of the contestants is that, by reason of his long and severe illness and its attendant consequences, at the time of the making of the will in question he was not mentally competent to make the same.

The daughter Mrs. Hoit attended him as nurse throughout the night of June 11th, and up to about 11 o'clock of the morning of June 12th. She returned to his bedside at 4 or 5 o'clock in the afternoon of the same day. She testified, as a witness, that she gave him a morphine tablet in the night, and again in the morning; that the effect of these tablets was to produce a stupor; and that he was in such stupor at the time of her leaving, at 11 o'clock; that, upon her return in the afternoon, he was still in a stupor; that she remained with him for the rest of the day; and that he did not at any time speak or give recognition to any person during such time.

This witness, though a beneficiary of the will, was a witness on behalf of contestants, and frankly avowed herself as insistent upon the invalidity of the will. Considerable evidence was introduced on behalf of the proponents, as well as considerable cross-examination tending to show the hostile attitude of the witness. But such evidence was impeaching only in its character, and was for the consideration of the jury alone. The evidence of the witness, however, has corroboration in the cross-examination of the witness Harbor, one of the subscribing witnesses to the will, and witness for the proponents. He testified as follows:

"On the day the will was made, Mr. Hook did not ask me to sign the will as a witness. I cannot recall anything he said, the day I witnessed the will; he did not say much of anything. I did not see Mr. Hook make his mark on the will. Mr. Nash was between me and Mr. Hook. I did not hear any conversation between Mr. Hook and myself or between Mr. Hook and anyone else there on that occasion,

in reference to the will. The will was not read to Mr. Hook while I was there, and he did not read it."

The method of execution of the will by the testator was that he rested his hand upon the hand of his attorney, while the attorney wrote his name thereto.

Without entering into further details, or giving any consideration to contradictory or impeaching evidence, we think that this evidence, in the light of the record, made a question for the jury.

2. WILLS: testamentary capacity: unrecognized expert theory.
The contestants did introduce the evidence of the attending physician and two other physicians who had attended the testator on one or two occasions during his illness. These physicians all testified to their opinion that he was mentally unsound. This opinion, however, was based, in part at least, upon the convenient theory that, inasmuch as he was bodily sick, he could not have been mentally sound; that the mind is dependent upon the brain, and that the brain is dependent upon the other organs of the body; and that an autopsy disclosed a mortal condition of all such organs, though no examination was made of the brain. Such theory is mere subtlety, and not expert medical opinion. It is of no aid to a judicial investigation of the sufficient mental capacity of a testator to make a will.

So far, therefore, as this feature of the medical testimony is concerned, we quite disregard it in reaching our conclusion. The medical evidence did tend to show an advanced state of arterio-sclerosis, as indicated by high blood pressure during life, and by the revelations of an autopsy thereafter. There was some nonexpert evidence, also, of hallucination and mental wandering.

For the reason indicated, the directing of a verdict for the proponents cannot be sustained. The judgment below is, therefore, reversed, and the cause remanded for a new trial.—*Reversed and remanded.*

WEAVER, C. J., PRESTON and SALINGER, JJ., concur.