IN RE WILL OF JACOB MUHR.

. LENA SEYLLER et al., Appellants, v. HENRY MUHR, Appellee.

No. 42526.

SEPTEMBER 18, 1934.

Salinger, Reynolds & Meyers, for appellants.

Wayne E. Sawtell, and Helmer & Minnich, for appellee.

ANDERSON, J.—This is a contest over the will of Jacob Muhr. For more than forty years Jacob Muhr owned a 240-acre farm in the southern part of Carroll county, and at the time of his death, on December 28, 1932, he also owned a small home in the town of Dedham, and had a small amount of money not exceeding $3,000. There is no testimony as to the value of the real estate. At the time of his death, Jacob Muhr was past eighty-two years old. His wife died about three years prior to his death. Surviving the testator were six children, two sons, William and Henry, and four daughters. The son Henry is the contestant and appellee herein. William occupied the farm as a tenant, at least until May 21, 1930, at which time the land was conveyed to him for an expressed consideration of $21,600. The consideration was represented by the promissory note of William, payable to his father, and due eighteen months after the death of the father. There is nothing in the record to show inadequacy of the consideration for this transfer. Shortly after the death of his wife, the testator, Jacob Muhr, left the little home in Dedham and took up his residence with his son William on the farm, where he continued to reside until his death in December, 1932. On the same day that the deed of the farm was executed to the son William, Jacob Muhr made a will in which he directed that his son William pay to the other surviving children the following sums: To the daughter Lena, $4,000; to the daughter Theresa, $4,600; to the daughter Cecelia, $5,000; to the daughter Anna, $5,000; to the son Henry (the contestant), $3,000, and provided that said designated payments, when made, should constitute a full settlement of the promissory note of William for $21,600. The will also bequeathed to each of the four daughters $1,000, and to the son William an automobile and household goods. A grandson (a son of a deceased daughter) was mentioned in this will, with a statement that the testator desired to give him nothing under the will. This will had apparently been destroyed, as its contents were introduced into the record from the shorthand notes of a stenographer to whom it had been dictated. The will in contest here was executed August 5, 1932, and under the terms of this will a slightly different distribution of the estate was made. The bequest to the daughter Lena was changed from $4,000 to $3,000; the bequest to the daugh-

ter Theresa was changed from $4,600 to $6,000; the bequest to the daughter Cecelia was changed from $5,000 to $4,000; the amount of the bequest to the daughter Anna was not changed, but the bequest was made to her husband, John Lingel, instead of direct to her, and $1,000 was bequeathed to Angeline Lingel (she being the child of the daughter Anna). A bequest was also made to Caroline, the wife of the son William, of $2,600. The further provision was made that the making of the foregoing payments to the various legatees named should constitute a full settlement of the $21,600 note. A further bequest was made to Caroline, wife of William, of $3,000. The grandson (son of a deceased daughter) and the son Henry were mentioned in this will, but with the statement that the testator desired to give them nothing under the will. There is also a statement in this will bequeathing to the son William all the residue and remainder of the estate. However, there is nothing in the record to show that there is any residue or remainder.

The record shows that the will in contest was prepared by a lawyer in Carroll, on the date it bears, executed by the testator and witnessed by two men who were in the banking business and with whom the testator had done some of his banking business. The record also shows that the testator went to the office of this attorney alone and told the attorney in detail how he wanted his will prepared. The attorney testified that the testator handed him the $21,600 note and said that he wanted it divided up among certain of his children and gave the amounts that he desired each to have. That he (the attorney) put down the several amounts as instructed by the testator, and the testator then said to him, "Now add that up, will that amount to the same amount as the face of the note?" That he was told that it would amount to the face of the note, and he said "that was right." He then gave to the attorney the names of each of his children and the designated amount that he desired each to have, including his daughter-in-law, Caroline, and his granddaughter, Angeline. The testator specifically instructed the attorney that he did not want to give his grandson anything, nor his son Henry, and he gave as a reason for not giving his son Henry anything that he had mistreated his mother and the testator. The testator also told this attorney that he wanted to make the bequest indicated to his daughter-in-law, Caroline, the wife of his son Wil-

liam, because she had nursed him so long, and so well, and he preferred giving it to her instead of his son William.

The proposed will was contested by the son Henry on the grounds of insufficient mental and testamentary capacity, and undue influence. Said undue influence was alleged to have been exercised by the son William, whom the contestant alleges was the principal and residuary legatee under the will. Under the record, there does not seem to be any residuary estate. At the close of the contestant's case, the court withdrew from the jury the question of mental incapacity, and submitted to the jury only the question of undue influence. There was a verdict for the contestant. A motion for new trial and exceptions to instructions were overruled, and a judgment was entered denying the admission of the will to probate and taxing the costs of the proceedings to the proponents. The proponents appeal.

There are many errors assigned, but it will not be necessary to notice all of them. As we have indicated, the court withdrew from the consideration of the jury the question of mental incapacity, but allowed evidence which had been introduced bearing on this question to remain in the record, apparently on the theory that such evidence was competent to show that the testator was more susceptible to undue influence by reason of a weakened or impaired condition of the mind. We do not think such testimony should have been allowed to remain in the record, for the reason that it did not in any degree tend to show a weakened or impaired mental condition. In this connection the court instructed the jury that a person of weakened or impaired mind is more susceptible to undue influence than a person of sound mind. This is not a correct statement of the law. The instruction should be that a person of weakened and impaired mind *may be* more susceptible to undue influence, depending upon the extent to which the mind is weakened or impaired, if at all, as shown by the evidence.

The court properly instructed the jury that, since the issue of testamentary capacity had been withdrawn by the court, the jury should consider as an established fact that the testator was possessed of testamentary capacity at the time of the execution of the proposed will, and that the unequal distribution of his property among his children is not sufficient to invalidate a will; and the court also properly instructed the jury that the execution and delivery of the deed and note mentioned constituted no evidence of undue influence.

The court also instructed the jury that evidence that the testator at times walked the floor with his hands behind him, that at times he was seated at a table with his head in his hands or arms lying on the table, that he talked to himself, and that he would mumble, did not tend to prove any matter in issue, and that the jury should wholly disregard such testimony and attach no weight thereto.

██ The court also properly instructed the jury that opportunity to exercise undue influence is no proof that it was exercised, and that opportunity and disposition, plus persuasion and importunity, are not sufficient proof to establish undue influence; and that, if the contestant had not proven the operation of undue influence at the very time of the execution of the will in question, it should be admitted to probate.

While we cannot approve the instructions as a whole, they were the law of the case as given to the jury, and we are of the opinion that the verdict of the jury is contrary to the instructions.

The only testimony that would in any way tend to establish the claim of undue influence exercised over the testator by the son William was some testimony that the son William told his father that Henry was a prohibition agent; that this statement was repeated to the father more than once; that it made him mad; and that, while he questioned the truth of the statement, he said that no prohibition agent could inherit any of his property. There is also testimony to the effect that William had said to his father: "You better not let Henry go to the bank too much for you. You know when he was at Idaho Springs he knew about your banking business and that is what he wants to know, so if you got any business to do let him pay it out of his own pocket and you pay him later." On another occasion the son Henry had given his father some laxative tablets. The father said they had worked fine, and the son William had said to him, "Better be careful, there is liable to be poison in them." The father also complained that during the last sickness of the mother Henry had washed a rug and placed it upon the floor wet, and the mother had stepped on it and caught pneumonia, and William at that time had said to his father, "He always does something wrong. If I were you, I would tell him to get out." Also the father had indorsed a check for Henry, and William said to his father, "You shouldn't do that, you don't know whether he has got any money in the bank or not." There is testimony also that soon after the mother died William told his father

there were some judgments or liens against Henry, and the father said that "if there were liens against Henry he could not receive anything in the will and he would have to give it to him in cash." This is practically all of the testimony tending in any way to show undue influence. There is no substantial evidence showing mental deterioration which might have made the father more susceptible to undue influence. There is no evidence of mental incapacity, and the court correctly withdrew this issue from the jury. Neither is there sufficient evidence of undue influence to warrant the submission of that issue to the jury. All of the statements alleged to have been made by William to his father in reference to the brother Henry were made, if at all, prior to March 20, 1930, and the will in question was not executed until August 5, 1932, nearly three years after the statements were alleged to have been made to the father by the son William. As far as the record shows, William was not present when the proposed will was executed, made no suggestions at any time as to its contents, and had nothing to do whatever with its preparation and execution. Incidentally, William denied making any of the statements to his father as testified by the contestant, Henry, and one or two other witnesses. The record shows that Henry had left home when he was about nineteen years old and had seen his parents only occasionally from that time until his mother's death, and that he did not see his father thereafter; that he lived in Sioux City, only a short distance from the home of his parents, but had not visited with them nor seen them for at least six years before his mother's death. Even some time after the alleged derogatory statements were made by William to his father, his father expressed his intention to give Henry some cash in lieu of a distribution under his will. The testimony as to mental unsoundness was all given by witnesses who had not seen the testator for nearly three years prior to the date of the execution of the will, and no one attempts to testify as to the mental condition of the testator at the time the will was made, other than the person who prepared it and the witnesses thereto, who were witnesses for the proponents.

At the time the will was executed, the testator was about seventy-nine years of age. He was a hardy, upright, frugal German. As testified by a priest who had known him for some time, "He was a stern, upright man and with fixed opinions, not easily influenced."

And this expressed opinion of the old gentleman is borne out by the entire record in this case.

We are abidingly convinced that there was no evidence of undue influence, as shown by this record, and that this issue should not have been submitted to the jury upon this record. As bearing upon the questions here involved see, In re Will of Diver, 214 Iowa 497, 240 N. W. 622; Worth v. Pierson, 208 Iowa 353, 223 N. W. 752; Firestine v. Atkinson, 206 Iowa 151, 218 N. W. 293; Cookman v. Bateman, 210 Iowa 503, 231 N. W. 301.

Without extending this opinion and noticing many alleged errors as to the admission and exclusion of evidence, and as to instructions given by the court, and requested instructions refused, we are constrained to hold that the court erred in not sustaining proponents' motion for a new trial.. A reversal necessarily follows. —Reversed.

MITCHELL, C. J., and EVANS, STEVENS, KINTZINGER, DONEGAN, and CLAUSSEN, JJ., concur.