ROSE (also known as MRS. AMBROSE) JAEGER, appellee, v. HENRY
HACKERT et ux., doing business as HACKERT HATCHERY,
appellants.

No. 47602.

(Reported in 41 N.W. 2d 42)

FEBRUARY 7, 1950.

Bray, Carson & McCoy, of Oskaloosa, for appellants.

Gilbert & Scholz, of Oskaloosa, for appellee.

MULRONEY, J.—Plaintiff, a turkey raiser, purchased 3112 turkey poults from defendants' hatchery which were delivered to her in the late spring of 1943 in three deliveries on the days the poults were hatched, to wit, 1545 on April 27, 1064 on May 1, and 503 on May 4. She paid $1887.56 for the poults, and shortly after they were delivered to her they started dying, until 1673 of said poults died by July 31, 1943. On April 21, 1948, she filed her suit against defendants alleging that defendants warranted the poults as being "good, healthful and free from disease" and that the warranty was breached in that the poults were at the time of delivery "unhealthy and diseased" and the "turkey poults were infected with pullorum disease." The prayer was for judgment in the sum of $4500.

Defendants' answer admitted the sale but denied the warranty and the breach. Counsel for defendants admitted in his opening statement to the jury that there was an express warranty that the poults were free from disease and were healthy birds, and the court instructed, without objection, on the theory of express warranty. The jury returned a verdict for $2016.14 and defendants appeal from the judgment entered thereon asserting the trial court erred in certain rulings on admission of evidence and in certain instructions given to the jury.

I. The plaintiff as the first witness in her suit testified that she entered in a book entitled "Farm Account Book" a daily record of the poults that died during the year 1943. She testified that the entries therein were true and correct, all in her own handwriting and that on the evening of each day when she found dead poults she wrote down the month and day and the number of poults that had died on that date. When the book was offered in evidence defendants asked leave to cross-examine plaintiff with respect to the book. The leave to cross-examine was granted and thereafter defendants objected to the admission of the book on the ground it was not a general book of account but contained merely self-serving declarations not binding on defendants and irrelevant and immaterial. The trial court sustained the

objection, stating, however, to plaintiff: "It is available for refreshing your recollection * * *." When direct examination of plaintiff was resumed she testified she could remember that around 1600 poults died between April 27, 1943 and August 1, 1943 but could not remember the number of poults that died each day of said period. The book was again offered in evidence and defendants objected and the court again ruled that while the book would not be admitted, plaintiff would be permitted to refer to the book in testifying concerning the dates when the poults died and the number of poults dying on each of said dates. Plaintiff then, by referring to the book, testified as to the number of poults that died on various dates between April 27 and August 1, 1943. Defendants say in argument plaintiff "read" this from the book and plaintiff's brief does not exactly deny the charge.

Defendants assign error in the trial court's "permitting plaintiff to testify from and read to the jury the entries in the book." The only case cited by defendants is State Bank of Tabor v. Brewer, 100 Iowa 576, 577, 69 N.W. 1011. In that case a bank cashier was permitted, over objection, to testify from a record book which he had made and knew to be correct. The opinion states:

"The ruling of the court, when made, was correct. If it appeared on cross-examination that the witness, after refreshing his memory, could not recall the matters referred to, the defendant might properly have moved that the evidence already given be stricken from the record."

This statement in the Brewer case is dictum and the case has never been cited as authority that a memorandum made by the witness at the time of the transaction, and now known by the witness to be correct when made, is inadmissible or cannot be used by a witness merely because the witness has no present recollection of the transactions recorded in the memorandum. The rule is that such a memorandum is admissible. It is best stated in Graham v. Dillon, 144 Iowa 82, 84, 121 N.W. 47, 48, where a number of decisions of this court and courts of other states are cited and the pronouncement made that:

"Under the rule of the cases cited, if a witness can testify

that at or about the time a memorandum or entry was made he knew its contents, and knew it to be true, his testimony and the memorandum are both competent evidence, although the witness cannot testify to the facts as a matter of independent recollection, even after his memory has been refreshed."

See also Worez v. Des Moines City Ry. Co., 175 Iowa 1, 9, 156 N.W. 867, where the foregoing rule was quoted with approval, and the note in 125 A. L. R. 19.

Defendants in argument seem to recognize the foregoing rule as being the law of this state with respect to the admission of a memorandum made by a witness, for their entire argument (aside from merely citing State Bank of Tabor v. Brewer, supra) is that the rule of the Dillon case does not apply "for the reason that the undisputed evidence here clearly establishes that the entries in plaintiff's book, Exhibit B, which she read to the jury could not have been made at or near the times listed in the book." Defendants point to the entries in the book showing 284 poults had died by May 4, the date of the third delivery of poults, and the evidence that plaintiff was given a discount of $30 when paying for the poults delivered on May 4, and the evidence of defendants that on May 4 plaintiff was claiming she had lost 27 poults and the discount was to cover loss of 50 poults, and then defendants pose the questions:

"If appellee accepted $30 on May 4 for the 27 poults which she then claimed had died, is it likely that at that time she had written in her private book, Exhibit B, the death of 3 poults on April 27, 18 poults on April 28, 36 on April 29, 29 on April 30, 53 on May 1, 51 on May 2 and 46 on May 3? * * * If she had made entries in her book showing the death of 238 poults by the end of May 3, would she have accepted 500 more poults on May 4?"

The trouble with this argument is that it is based on defendants' version of the May 4 incident which was denied by plaintiff. Plaintiff testified she was taking the last delivery on a prior order placed in the early spring of 1943 for 3000 poults. She further testified:

"When Mr. Hackert made the delivery on May 4, I didn't tell him that 27 poults had died. I gave him the full amount. He

didn't say that he would allow me credit for 50 poults which would be the normal death loss on the last bunch of turkeys. I paid for the May 4, 1943 delivery with a check in the amount of $275. He did not state that I was getting an allowance of $30 for the turkeys that I claimed had died."

She went on to testify that she told defendant at this meeting on May 4 that "Dr. Killips said the poults were sick" and she asked him what he was going to do about it and she understood him to say "he would come down and see them later and see how many more would die."

With these two versions of the May 4 incident it is obvious defendants' argument is not based on "undisputed facts [that] clearly establish that no such entries appeared in the book, Exhibit B, on the 4th day of May, 1943." It is based on disputed testimony and the question was for the jury.,

Under the rule previously stated we hold the book, Exhibit B, would, under the record, have been admissible and therefore no reversible error resulted from the witness reading the entries in connection with her testimony.

▍ II. Plaintiff testified that she went to defendants' hatchery on May 22, 1943, and told them that the poults she had received had pullorum, and that she showed defendant Mr. Hackert a letter identified in the record as Exhibit C and that he read the letter. Plaintiff offered the letter, Exhibit C, in evidence for the limited purpose of notice. The letter dated May 17, 1943 appears to be a copy of a letter sent by a Kansas City laboratory to Dr. Killips, plaintiff's veterinary, who had sent some of her poults to the laboratory. The trial court, over defendants' objection that the letter was incompetent, irrelevant, immaterial, and hearsay, admitted the letter "for the purpose of showing notice and for no other purpose." After both sides had rested defendants moved that Exhibit C be withdrawn. The trial court in ruling on the motion stated that there were statements in the letter that he felt should not go to the jury. The court's ruling was that the letter would be withdrawn but that the court would "formulate an instruction with reference to the letter that will cover the notice proposition." In instruction No. 5 the court told the jury "that there had been admitted in evidence for the pur-

pose of showing notice a letter identified as Exhibit 'C' bearing date of May 17, 1943 and directed to Dr. H. Killips, a witness for the plaintiff in this case, containing statements as to the claim of the plaintiff that the poults in question were afflicted with the disease of pullorum." The instruction went on to tell the jury that notice was required (section 554.50, Code, 1946) under plaintiff's claim, and again cautioned that the letter had been admitted on the theory as stated by plaintiff that it was delivered to the defendants on or about May 22, 1943, and was admitted solely for the purpose of showing notice, but the letter itself would not be submitted for it contained "much incompetent and irrelevant matter."

Defendants argue the court erred in admitting the letter. Exhibit C, in evidence and erred in giving an instruction to the jury containing part of the contents of the letter. The record with respect to this letter is quite strange. In the first place what we have heretofore said about the letter we learn partly from defendants' cross-examination of plaintiff and partly from plaintiff's brief, which sets out a purported copy of the letter. The letter was not read into the evidence after it was admitted. Defendants cannot be blamed for bringing out part of the contents of the letter in cross-examination of plaintiff, for the letter was then in evidence. Defendants' counsel states that after the letter was withdrawn he sought a copy of it to incorporate in the record for this appeal but was informed by plaintiff's counsel that the letter had been misplaced in their files and anyway it should not appear in the record because it had been withdrawn by the trial court. There is no question but that an exhibit once admitted in evidence but later withdrawn should still be available for any party prosecuting or defending an appeal. When it has some bearing on a contemplated or asserted claim of error it should be included in the record. Defendants do not claim that the copy set forth in plaintiff's brief is incorrect so we will consider it a true copy of Exhibit C as if the same were contained in the record.

In the second place the trial court's ruling is rather strange. While the court withdrew the physical exhibit he does not seem to have withdrawn the evidence. This is shown by the language of his instruction to the jury where he told the jury

"there has been admitted in evidence * * * a copy of a letter * * *. This letter was admitted * * * and [the letter] was admitted into the record * * *." We know of no rule of procedure or any precedent for such action of the trial court. The result of the trial court's ruling was that the letter and all of its contents were *excluded* from the record. The only way documentary evidence can be admitted into the record is by reading the document into the record or by admitting it as an exhibit that goes to the court or jury. The trial court's statement in the instruction as to the contents of the letter, sent by someone to Dr. Killips, is not a record of testimony. The contention of defendants that after the withdrawal of the letter the instruction in regard thereto was not sustained by the record is well taken. We have often held that instructions that assume the existence of facts not in the record are erroneous. Moorehead v. Hyde and Braden, 38 Iowa 382; Root v. Schaffner, 39 Iowa 375; Plantz v. Kreutzer & Wasem, 175 Iowa 562, 154 N.W. 785; Millard v. Northwestern Mfg. Co., 200 Iowa 1063, 205 N.W. 979.

In Hill v. Hill, 55 Ga. App. 500, 503, 190 S.E. 411, 414, the trial court had ruled out all evidence pertaining to an agreement and thereafter charged the jury with respect to such an agreement. In holding the trial court erred the supreme court stated:

"After having ruled out the evidence as to this agreement, the court erred in charging the jury in regard thereto. It is well to state that this is not a ruling on the admissibility of the evidence as to the agreement."

In Baer Bros. Land & Cattle Co. v. Palmer, 10 Cir., Colo., 158 F. 2d 278, 280, the trial court, upon motion, withdrew the testimony of a certain witness "Lowell" who was the only witness who testified as to a certain element of damage. Thereafter the court instructed the jury, drawing attention to the withdrawn testimony, and the instruction stated the "testimony presented an element of damage for the jury's consideration." Upon appeal the cause was reversed, the opinion stating: "The court's ruling withdrawing the testimony from the jury and the quoted instructions are conflicting and misleading. * * * the conflict is so marked and so misleading as to require reversal." Citing cases.

To the same effect see Walsh v. Jackson, 33 Colo. 454, 81 P. 258, and Baker v. Goddard, 205 Ga. 477, 53 S.E. 2d 754.

■ Plaintiff in argument does not attempt to justify the court's procedure but she argues no error resulted because (1) the letter, Exhibit C, should have been admitted, and (2) under the whole record no prejudicial error resulted. There is no merit in the first proposition that an instruction based on excluded testimony would be proper if the testimony was erroneously excluded. The error lies in instructing on evidence that is not before the jury. The reason why the evidence is not before the jury is immaterial. We said in Plantz v. Kreutzer & Wasem, supra, at page 574 of 175 Iowa, page 789 of 154 N.W.:

"Juries cannot be permitted to speculate as to the existence or nonexistence of material facts. They cannot be permitted to rest their finding upon mere surmise or speculation. There must be a basis in the evidence before the jury can be permitted to say that a fact exists."

The case of Baer Bros. Land & Cattle Co. v. Palmer, previously discussed, is directly in point. There the opinion reversed because of the charge with respect to the withdrawn testimony of Lowell but the opinion goes on to hold the withdrawn testimony should have been admitted, stating that attention is called to this error "so that upon retrial the correct rule may be followed."

So also in Hill v. Hill, supra, the court was careful to point out that while it was error to instruct on testimony that had been ruled out, the holding was not to be construed as a ruling on the admissibility of the evidence.

As somewhat in point see Peterson v. McManus, 187 Iowa 522, 538, 172 N.W. 460, 466, where the court held rejected testimony should have been admitted but it was not error for the court to refuse to instruct as to the rejected testimony, the opinion stating:

"After the court sustained objections to this testimony, there was no evidence to warrant it in giving such an instruction. The complaint should not be that such a charge was not given, but that an erroneous ruling on testimony brought it about that no such instruction could be given."

The question then survives whether under the whole record the error was prejudicial. Taking the letter as admissible if at all, as a part of the required notice, it was merely cumulative. Both parties so argue. Plaintiff testified she told defendants on May 4 that "Dr. Killips said the poults were sick." She also testified: "It was shortly after the 10th of May. After the delivery I called Mr. Hackert on the telephone from Dr. Killips. I told him I was at the doctor's office and that the poults had pullorum and I would like to see him. He said he would come down to see me, but he didn't come."

Then as to the incident of May 22 plaintiff testified:

"I next saw him on May 22, a Saturday, when Mr. Streit took me and my daughter to the Hackert farm near Leighton. Mr. Streit was my feed man. He now lives in Cedar Rapids. Mr. Hackert seemed to be very busy and didn't have time to talk to us. Mr. Streit and I told him how many poults we had lost, what condition they were in and that we would like for him to come down and make a settlement. We wouldn't leave until he had promised to do so. We told him Dr. Killips said the poults had pullorum. We told him the death loss and all about it. He said he didn't think they had pullorum. We showed him the letter that is Exhibit C. He read the letter. I do not remember whether or not he said anything about the letter."

Then follows the offer of the letter, Exhibit C, the objection and the ruling admitting the letter, which, at the close of all the testimony, was withdrawn.

From the above it will be seen there was abundant evidence of notice without the letter. Plaintiff testified freely without objection that she told defendant on three occasions that Dr. Killips said the poults had pullorum. It is difficult to see how defendants were prejudiced when the jury is told that some other unidentified person also said in a letter that was shown to Mr. Hackert that the poults had pullorum. We said in Bridges v. Welzien, 231 Iowa 6, 10, 300 N.W. 659, 662: "An appellate court in passing upon alleged errors in instructions should always keep in mind the query: 'Is it reasonably probable that the instruction as given misled the jury to the prejudice of the complaining party?'"

It is inconceivable that the jury was misled in this case to the defendants' prejudice by the instruction, even though the evidence, Exhibit C, upon which the instruction was based was not in the record of proof. The jury had heard some questions and answers about the letter in the direct and cross-examination of the plaintiff, and that evidence had not been withdrawn. The court was charging with respect to a minor issue in the case—the notice—about which there was an abundance of other evidence, and the letter was only a fragment of the testimony plaintiff gave as to notice. In other words, if the jury relied upon the letter which was not in evidence the jury would have had to believe plaintiff's version of the May 22 incident when she testified she gave the letter to defendant Hackert to read. If the jury believed plaintiff's testimony then notice was established prior to the introduction of the letter, Exhibit C, for she testified: "We told him [Hackert] Dr. Killips said the poults had pullorum. We told him the death loss and all about it." The only thing the instruction did was add to this testimony that plaintiff showed Hackert a copy of a letter which is not in evidence, wherein some-one else also said the poults had pullorum. The addition was inconsequential especially when limited to the issue of notice. The probability that the jury was misled is too remote. We are not disposed to reverse because of the error. Lenth v. Schug, 226 Iowa 1, 281 N.W. 510, 287 N.W. 596.

The situation is not unlike that where we have held harmless error results by the admission of improper evidence where the fact thereby sought to be shown is otherwise fully shown by an abundance of testimony. Silvers v. Floyd, 151 Iowa 415, 131 N.W. 652; Kirkwood v. Perry Town Lot & Improvement Co., 178 Iowa 248, 159 N.W. 774.

III. Defendants contend that plaintiff failed to establish damages in that the evidence does not establish that over 50 poults died of pullorum (of the 1673 poults that the evidence shows, died). The evidence shows that primary pullorum is used to designate a bird infected while in the egg, while secondary pullorum is that picked up by birds from other infected birds or premises. The birds infected primarily will die from one to eleven days after hatching. The disease is highly contagious and spreads rapidly through the flock and the mortality rate in a flock

from the disease can be as high as seventy-five per cent to one hundred per cent within ten to fifteen days.

The record shows Dr. Killips examined over one hundred birds during the period they were dying at a high rate and his diagnosis of those he examined was that they died of pullorum. The evidence created a question for the jury as to how many poults died of pullorum. It cannot be said that the jury's finding, that poults other than those examined by Dr. Killips died of pullorum, is based on a possibility, suspicion or surmise. The evidence was sufficient to warrant a reasonable inference that all of plaintiff's death loss of poults was due to pullorum. Patton v. Ballam, 115 Vt. 308, 58 A. 2d 817; Letres v. Washington Co-operative Chick Assn., 8 Wash. 2d 64, 111 P. 2d 594; Dougherty v. Lee, 74 Cal. App. 2d 132, 168 P. 2d 54; Lewin v. Pioneer Hatchery, 99 Cal. App. 473, 278 P. 902.

■ IV. Defendants also contend the amount of plaintiff's damages was not shown with reasonable certainty. It is shown the poults cost an average of about sixty-one and one-half cents each and an additional five cents each for insurance for loss other than by disease. The evidence as to these items of damage was certain. If the warranty was breached plaintiff was also entitled to the expense of taking care of the poults that died by reason of the breach. Joy v. Bitzer, 77 Iowa 73, 41 N.W. 575, 3 L. R. A. 184. Defendants' chief complaint is as to the testimony concerning the value of labor and the amount and value of feed, gas, oil, litter, and medicine for the turkeys that died. The only testimony in the case is plaintiff's testimony as to the value of labor caring for plaintiff's entire flock of 3100 turkeys during the period involved, about $1650, and the amount spent for feed, gas, oil, litter, and medicine for the entire flock during the same period, about $1816.

■ Where it has been proved that damage has resulted and the only uncertainty is as to the exact amount, it is sufficient if the record shows "data from which the extent of the injury * * * can be ascertained with reasonable certainty * * *. Data for an exact calculation is not necessary." Osterling v. Frick, 284 Pa. 397, 404, 131 A. 250, 252; 25 C. J. S., Damages, section 28.

The evidence shows plaintiff raised her flock of turkeys as a unit. The evidence furnished the jury the dates when the

poults died. It also furnished the jury the reasonable value of labor per day for the whole flock, the reasonable value of feed, gas, oil, litter, etc. for the whole flock from April 27 to May 31; the same for the month of June; and the same for the month of July. This gave the jury about all of the information that could be given as to the value of labor and cost of feed, etc. up until July 31 when fifty-three per cent of the flock of poults were dead. We think it furnished the jury sufficient evidence by which it could measure the damage, for under the court's instructions the issue as to how many poults had died of pullorum was for the jury.

V. Defendants assign error in sustaining objections to a number of questions asked defendant Hackert. His counsel asked him:

"Did you have any sickness in any of those turkeys of any kind that year [1943]? Did you call him [Dr. Killips] at any time in 1943 to treat turkeys for you? Did you call any veterinarian in 1943 to treat sick turkeys for you? Did you call any veterinarian in 1943 to treat turkeys that had pullorum? Did you have any complaints that any of the poults that you hatched in 1943 from these same hens on April 27 and later had the disease of pullorum? How many turkeys that you raised in 1943 did you market?"

The court sustained objections to all of the above questions as either immaterial or irrelevant.

Aside from the fact that the failure to make an offer of proof leaves nothing to review (Reynolds & Heitsman v. Henry, 193 Iowa 164, 185 N.W. 67), it is apparent that the only questions which might be argued are material were substantially answered by the same witness prior to the propounding of the foregoing questions. He testified:

"In 1943 we raised 3000 or 4000 turkeys. They were part of our own hatch. In 1943 we had between 700 and 800 laying turkey hens. * * * These hens were tested before the laying season began. The tests were made to ascertain whether or not the hens were free from pullorum. I tested them myself. They did not have pullorum. * * * We did not have pullorum in the poults

that we hatched in 1943 and raised ourselves." The defendant Mrs. Hackert testified: "We didn't have any sickness in the poults hatched in 1943. We have never had any pullorum on the farm."

Generally it can be said that no error can be predicated on the exclusion of testimony when the facts sought to be proved are established by other evidence given by the same witness. Allison v. Chicago & N. W. Ry. Co., 42 Iowa 274.

Under the whole record we find no prejudicial error in this assignment. As to matters not covered by other admitted testimony, such as whether or not there had been other complaints from customers or how many turkeys defendants raised for market, the objection of irrelevant and immaterial would be good. One would have to explore the other sales to see if they were similar or made upon express warranties and soon the evidence would be far afield from the determinative issues in the case. The court had to select some point to cut off the inquiries into collateral matters and we are not convinced the court was wrong in sustaining the objections that were made.

VI. Another turkey-hatchery operator testifying for defendants was asked if it was not the practice of turkey raisers to use laying hens only one year. Plaintiff's objection that the question was leading and irrelevant, and no foundation laid was sustained. Whereupon defendants made a profert that if allowed to answer the witness would testify that such was the custom.

Defendants assert error in the court's ruling, stating the court should have admitted the testimony because in the cross-examination of Mr. Hackert he was asked if he did not get rid of the 1943 flock because they were infected with pullorum. He replied that they were not sold for that reason but defendants state that "an insinuation was raised that the hens were sold for that reason," and the profert was to rebut such an insinuation. The record shows defendants' counsel told the court at the time the profert was made that it was for the purpose of rebutting the said insinuation.

The court might well have admitted the testimony but we cannot see that any prejudice resulted. Not only did Mr. Hackert

deny that his 1943 flock of hens was sold because they had pullorum but he went on to say: "Turkey hens are never carried over. We bring in a new flock every year." He also testified on his direct examination: "We sold hens following each laying season, just using them one year." Evidence that in selling the hens each year he was following a custom observed by other turkey raisers would add but little to his denial that in 1943 he did not sell his flock because they were infected with pullorum.

▆▆▆ VII. Defendants assail the court's instruction wherein he told the jury:

"It is not necessary that the plaintiff should establish that all of the poults furnished or died were afflicted with such disease at [the time of] delivery, but it is sufficient if she has established that a part of them were so afflicted and that the loss she suffered by reason of the death of poults was caused by the delivery to her of some poults afflicted with such disease."

The contention here is somewhat like that previously urged with respect to the extent of damage testimony. Defendants argue the testimony only shows that the poults examined by Dr. Killips died of pullorum so there is no basis in the evidence for the instruction that would allow recovery beyond the number examined by the doctor. But the evidence also establishes that pullorum in poultry is a highly contagious disease. If the warranty was breached by delivery of some poults with this disease the defendants would be liable for all the loss plaintiff suffered "directly and naturally resulting, in the ordinary course of events" (section 554.70, paragraph 6, Code, 1946) from said breach.

In Joy v. Bitzer, 77 Iowa 73, 79, 41 N.W. 575, 577, 3 L. R. A. 184, we quoted with approval a rule from II Sutherland on Damages, page 435, as follows:

"If animals sold are warranted sound, and are not so, but have an infectious or contagious disease which they communicate to others, where the parties contemplate their being placed with other stock, the loss not only in respect to the animals purchased, but to others to which the warranted animals communicate the

disease, may be recovered, as well as the expense of taking care of and doctoring them."

. In Mitchell v. Pinckney, 127 Iowa 696, 700, 104 N.W. 286, 288, we approved an instruction described as a charge "that plaintiffs were entitled to fair and reasonable compensation for the loss which they sustained *to their other cattle* as the direct and natural consequence of the diseased condition of the cattle purchased of the defendants, provided the jury found that such disease was in fact communicated to such other cows." (Italics supplied.)

There was evidence that some poults died of pullorum within one, two, and three days after they were hatched and Dr. Killips testified that poults with primary pullorum often died within three days after hatching. Other poults died weeks after they were hatched but the evidence was that pullorum was a contagious disease that often spreads rapidly through a flock of turkey poults, causing a high death loss. The evidence was that the 50 to 100 dead poults examined by Dr. Killips died of pullorum. This was sufficient upon which the jury could base a reasonable inference that pullorum was communicated to other poults and they died from this disease.

Quite closely in point is Dougherty v. Lee, supra, as shown by the following quotation from the opinion:

"Seven of them [cows] died within twenty-four hours after eating baled Sudan hay purchased from the defendant immediately before that time. A post-mortem examination and pathological and chemical analyses of the contents of the stomach and of a portion of the liver of one of the dead cows disclosed, without conflict, the presence of botulina bacilla, and the symptoms of the sick cows indicated they were suffering from the effect of the same poison. An analysis of a sample of the same hay resulted in the discovery of 'what looked like botulina bacilla.' In our opinion that showing established a prima facie case of death of the seven cows from poison contained in the recently purchased hay, as the court affirmatively determined. Under such circumstances we may not disturb the findings and judgment on this appeal." 74 Cal. App. 2d at page 137, page 56 of 168 P. 2d.

 VIII. Defendants assail the instruction wherein the court charged that plaintiff's acceptance of delivery of some of the poults after some deaths had occurred among the poults previously delivered would not constitute "a waiver on her part of bringing suit for damages for breach of such warranty."

Section 554.70, paragraph 1b, Code, 1946, provides that where there is a breach of warranty the buyer may, at his election, "accept or keep the goods and maintain an action against the seller for damages for the breach of warranty."

It would seem the above statute would be a sufficient answer to defendants' argument that the instruction was a misstatement of the law. The record shows that 3100 poults had been ordered by plaintiff. They were delivered as they were hatched. Plaintiff had no way of knowing that the second or third deliveries contained, at the time of delivery, some diseased poults, even though she knew poults of prior deliveries had died of pullorum. She had the right to accept delivery of all the poults previously ordered and sue. for damages if the warranty was breached. Laporte Improvement Co. v. Brock, 99 Iowa 485, 68 N.W. 810, 61 Am. St. Rep. 245.

The foregoing disposes of the questions in the case so far as they are discussed by counsel. The judgment of the trial court is affirmed.—Affirmed.

All JUSTICES concur.