IN RE ESTATE OF HENRY J. HURLBUT.

ELIZABETH J. HURLBUT, proponent-appellant, v. ROBERT K. HURLBUT et al., contestants-appellees.

No. 47782.

(Reported in 46 N.W.2d 66)

354

FEBRUARY 12, 1951.

Hart & Hart, of Elkader, for appellant.

M. X. Geske, of McGregor, and J. J. Hyde, of Elkader, for appellees.

MULRONEY, J.—The children of Henry J. Hurlbut, deceased, filed objections to the probate of his will alleging the testator was of unsound mind and incapable of making a will; that he had been subjected to the undue influence of proponent; and that he had been induced to make the will in proponent's favor by reason of the latter's fraud and false representations. The will gave testator's two adult children '$1.00 each and almost all of the rest of his property to proponent whom he had married about three and a half months before he died.

Upon the trial the court submitted the issue of undue influence only and the jury returned a verdict for contestants. Upon this appeal the first challenge is that the evidence was insufficient to warrant submission of the case to the jury.

██ I.  Viewing the record in the light most favorable to contestants we hold the evidence sufficient to warrant the submission of the issue of undue influence to the jury. The testator was a widower about seventy years old in the latter part of 1948. He owned the Scenic Hotel in McGregor, Iowa, and worked as a conductor on the Milwaukee Railroad. He lived in an apartment in this hotel. His son, Robert, was married and lived in Madison, Wisconsin, where he was district passenger agent for the Milwaukee Railroad. His daughter, Mabel Sielehr, was a patient at the Lakeview Tuberculosis Sanatorium which was apparently in or near Madison, Wisconsin. She had seven children ranging in age from seven to twenty-four years. Her husband, Norman, was also an employee of the Milwaukee Railroad, and the deceased held a mortgage on their home in Madison in the sum of $2600.

The record shows a friendly feeling existed between the father and his two children and he saw them frequently as his run necessitated a layover of several hours in Madison. In December of 1948 the father visited the sanatorium, and Mabel, whose room was close to the nurses' desk, overheard him ask as to her condition. She said she was given two months to live and that her father cried and was very upset. Mabel died before the trial and her testimony was by deposition.

The proponent was a practical nurse about fifty-eight years old, who had worked at the sanatorium for about a year and a half prior to December 1948. She was divorced from Raymond Roth in August of 1948. She took care of the patients in the sanatorium, including Mabel. About December 15, 1948 she heard deceased, on one of his weekly visits to Mabel, say that he was a conductor on the railroad and that he owned a hotel in McGregor and she later asked Mabel for her father's address. There is testimony that she was an aggressive type of woman and after the December visit of deceased she would stay in the room when deceased visited his daughter, or come to the door and call him out, or meet him on the stairs before or after his visits. The

deceased and proponent started going out together once or twice a week to dinner and to shows. During the latter part of January proponent told the superintendent of nurses that "she expected to get the hotel at McGregor, a diamond ring and all of Mr. Hurlbut's money, $1000 of it immediately * * * that she intended to marry deceased, that he would make a will in her favor." This superintendent said it became necessary to move proponent to another floor as her presence upset Mabel, and Mabel testified her father made but few visits in February or March. On his last visit in March proponent was with him and she sat on his lap during the visit.

In the latter part of January the deceased underwent surgery in the Madison General Hospital for cancer. The proponent took time off from her job and was his special nurse for two nights. The doctor who operated on deceased said he told him after the operation that he would not recover; that he had a very short time to live. The proponent stated she knew deceased "had sarcoma, cancer affecting the blood stream." Robert visited his father while he was in the hospital with his father's unemployment insurance papers, and proponent, who was standing near the bed, tried to see the papers. Robert said he ordered her to leave the room and when she did not go a nurse came into the room and took proponent out.

The deceased recovered enough to go back to work and on April 6, 1949 he married the proponent in Elkader, Iowa. Prior to the marriage, deceased consulted Mr. Coon, a lawyer in McGregor, and also a Wisconsin lawyer with reference to whether they could be married in view of proponent's divorce in Wisconsin in August 1948. The Wisconsin lawyer testified he told deceased proponent could not marry until one year after the divorce, or August 1949. Mr. Coon was one of the witnesses to the marriage in Elkader, swearing that neither party had been divorced within the year. Mr. Coon testified that on January 24, 1949 (about the time of proponent's conversation with the nurse-superintendent) he drew a will for deceased which gave proponent $1000, and the hotel to proponent and his older sister, and the balance to his children. This will was executed in his office. He said that in May he drew a new will for deceased giving his sister a home for life and the balance to proponent.

This will was executed in the lobby of the Scenic Hotel. On June 18, 1949 he said deceased and proponent came to his office and he drew the will in question changing the provision as to his sister from a "home" for life to "room and board" and leaving $1.00 to each of his children. Proponent was not in the lawyer's private office when the will was executed and she said she had left the lawyer's suite before the witnesses to the will arrived. Immediately after the June 18 will was executed the prior wills were destroyed. Deceased died July 20, 1949. There is evidence of an incident a few days before he died when deceased's son and son-in-law tried to visit with him when he was apparently too sick to move or speak and, although the evidence was conflicting, the jury could believe proponent would not let them see deceased alone and ordered them to leave. Also the hotel building was sold for $20,000 in May of 1949, the purchasers paying $10,000 in cash and giving a mortgage back to deceased and/or proponent for $10,000. The proponent produced $8000 in United States savings bonds at the time of trial payable to "Henry J. and/or Elizabeth J. Hurlbut." On June 18, 1949, the day the will was executed, the deceased gave proponent a bill of sale to an itemized list of all of the furniture and silverware and all property in his Scenic Hotel apartment. The consideration recited was "one dollar and love and affection."

There was other evidence showing the complete change in the father's attitude toward his children after he started going with proponent and evidence from which the jury could infer this was caused by proponent's influence. We have not related all of the testimony, and some of the testimony we have recited was denied. It is not necessary to state more for the case must be reversed for instruction errors, but we feel the testimony makes out a case for the jury on the issue of undue influence.

The evidence would warrant an inference that proponent conceived a plan to get deceased's property almost from the time she met him and learned of his property. Six weeks after she met him she is telling the nurse-superintendent that she expected to get the hotel at McGregor and all of deceased's property and that she intended to marry deceased and "he would make a will in her favor." This conversation was almost the very day of the execution of the first will, which gave her $1000 and a half inter-

est in the hotel. Later, after she married deceased, the subsequent wills were increasingly in her favor until the last will, executed about a month before he died, gave her everything subject to the food-and-shelter provision, for deceased's aged sister. This will made his widow executrix and further provided that her decision on what would be "adequate" food and shelter for the sister was to be final. It is fair to assume she knew deceased had not many months to live, and that the change in deceased from a fond parent toward his children to a parent who disinherited his children was inspired by proponent. Deceased knew his daughter was dying of tuberculosis and yet he left proponent the mortgage on his daughter's home. Certainly something influenced this dying man to execute such an inequitable will, and from all of the testimony the jury could find it was executed in accordance with this aggressive nurse's plan—that it was her will and not deceased's.

Fact precedents are of little value. In some cases the evidence is stronger against the will on some points than here and weaker on others. Among cases where we held somewhat comparable evidence of undue influence sufficient are: Hansen v. Waugh, 237 Iowa 304, 21 N.W.2d 762; Shaw v. Duro, 234 Iowa 778, 14 N.W.2d 241; In re Estate of Eiker, 233 Iowa 315, 6 N.W.2d 318.

II. In instruction 3 the court first told the jury that the pleaded "issue of mental unsoundness of Henry J. Hurlbut has not been sufficiently established" and then, in the next two sentences stated: "Although the issue of testamentary capacity has been withdrawn, yet there is left in the case evidence which has been introduced to show the mental condition of Henry J. Hurlbut. You may consider such evidence as bearing upon his susceptibility to undue influence, if any, and upon his powers to resist the same."

This is a proper instruction to give in a case where there is some evidence of mental weakness, even though the evidence is insufficient to carry the issue of lack of testamentary capacity to the jury. Proponent objected to this instruction on the ground there was no evidence of mental weakness or unsoundness in this case. Contestants seek to sustain it by pointing to evidence of testator's physical illness and evidence that he had been seen

crying on one occasion in January 1949. Such evidence of bodily illness would not be evidence of mental weakness on which the court could base this instruction. In re Will of Hook, 189 Iowa 287, 178 N.W. 357.

The suggestion that this instruction could be based on the evidence of one witness to the will who said testator was of sound mind and two other witnesses who said generally that he was a man of strong mind would mean that the instruction was favorable to proponent. We feel the ordinary meaning of the instruction is that the jury can consider evidence of mental weakness or unsoundness. Its setting in instruction 3 where the court withdraws the pleaded issues of mental incapacity and fraud but tells the jury they can consider evidence of "mental condition" and "false representations" precludes any thought that the court meant evidence of a strong sound mind by the term "mental condition."

In no case has this court approved such an instruction where there was no evidence of mental weakness. Practically the same instruction was given in Hansen v. Waugh, 237 Iowa 304, 21 N.W.2d 762, and in In re Estate of Eiker, 233 Iowa 315, 6 N.W.2d 318, but in both cases there was evidence of the mental weakness of the persons who executed the wills.

III. A like error is asserted in that in this same instruction 3 the court, after instructing that the pleaded issue of fraud was not sufficiently established, stated that there was left in the case evidence which had been introduced to show alleged false representations on the part of the proponent and that this evidence could be considered as "bearing upon the question of undue influence, if any * * * ." As proponent points out, there was no evidence of false representations of proponent. The contestants seek to justify the instruction by the evidence of Coon's false statement as a witness to the marriage that neither party had been divorced within a year. But this was not proponent's false statement. At that time Coon was deceased's lawyer. But in any event deceased knew the statement was false. Deceased knew the proponent had been divorced in Wisconsin within the year. He had consulted two attorneys—one of them the attorney who had secured the divorce—about his right to marry pro-

ponent before the expiration of a year after her divorce. There was no basis in the record for the giving of this instruction.

■ The foregoing portions of instruction 3 constitute reversible error. They permitted the jury to speculate on such material facts as the weakened condition of testator's mind and whether proponent made false representations. With no basis in the evidence any finding on these matters would be based on surmise. It was prejudicial error to give these instructions under the record in this case. Plantz v. Kreutzer & Wasem, 175 Iowa 562, 154 N.W. 785; Jaeger v. Hackert, 241 Iowa 379, 41 N.W.2d 42.

■ IV. The contestants claimed a misjoinder of parties when Mabel died and the special administrator of her estate, appointed in Wisconsin, was allowed to be joined as party contestant. We have held the personal representative of a contestant's estate is the proper person to be substituted when the will relates only to personal property. In re Will of Wiltsey, 122 Iowa 423, 98 N.W. 294. The case does not specifically hold that a personal representative appointed in another state should be substituted but we feel such a substitution would be proper.

We need not consider other errors asserted. For the instruction errors set out above the cause is reversed and remanded for a new trial.—Reversed and remanded.

BLISS, OLIVER, SMITH, and HAYS, JJ., concur.

GARFIELD, J., and WENNERSTRUM, C.J., dissent.

GARFIELD, J. (dissenting in part)—I agree with Division I of the majority opinion except the statement therein that the case must be reversed for instruction errors. The verdict finds adequate support in the evidence and I would be slow to reverse the judgment entered thereon.

I. I respectfully dissent from the majority's holding in Divisions II and III it was reversible error to instruct that evidence of testator's *mental condition* (not mental weakness) may be considered as bearing upon his susceptibility to undue influence.

Instruction 3 plainly states the issue of mental unsoundness has not been established, is withdrawn from the jury and they

should consider it established that testator had testamentary capacity when he executed his will. The instruction then says: "Although the issue of testamentary capacity has been withdrawn, yet there is left in the case evidence which has been introduced to show the mental condition of Henry J. Hurlbut. You may consider such evidence as bearing upon his susceptibility to undue influence, if any, and upon his powers to resist the same."

The only objection in the trial court to this part of instruction 3 is that it permits the jury "to bring back into the case the issue of mental incompetency, and when that issue was taken from the jury it was taken as a whole and there was no attempt * * * to offer evidence of the mental condition of Henry J. Hurlbut as affects his susceptibility to undue influence." Of course no other objection to the instruction can be urged here. Rule 196, R. C. P.

Certainly the quoted part of instruction 3 does not "bring back into the case the issue of mental incompetency" as proponent contends. Nor does the majority so hold. The instruction is not vulnerable to proponent's objection. Nor does it lead the jury to believe, as the majority seems to feel, that "mental condition" means only "mental weakness." Plainly the two terms have different meaning.

There is neither reason nor authority to support the majority holding that such an instruction is proper only where there is evidence of mental weakness. At least this court has never before so held.

The quoted part of instruction 3 obviously was taken from the third instruction in Hansen v. Waugh, 237 Iowa 304, 316, 21 N.W.2d 762, 768. It is a verbatim copy of the portion of the instruction there quoted except for testator's name and the use of "his" for "her." In the cited case the only ground of the contest and of course the only issue submitted was undue influence. We there approve the instruction, stating, "There was evidence of Rikka's mental condition in the record and the instruction was proper. In re Estate of Eiker, 233 Iowa 315, 6 N.W.2d 318. See, also, Shaw v. Duro, 234 Iowa 778, 783, 14 N.W.2d 241." We do not say there was evidence of Rikka's mental weakness which rendered the instruction proper.

So there is evidence here of testator's *mental condition* and the instruction was proper. The majority opinion refers to three items of such evidence—that testator was of sound mind when his will was made and, from two witnesses, that he was of strong mind. If, as the majority apparently feels, this were all the testimony as to testator's mental condition this part of instruction 3 would not be prejudicial to proponent-appellant since it calls attention to testimony favorable to her.

However, there is other evidence which bears on testator's mental condition. In December 1948, he was "very worried, cried and was very upset." In January 1949, a witness saw him in the railroad station at Madison crying. After this he seemed in great pain or strain. On June 28, 1949 (the will was made June 18, thirty-two days before death caused by cancer from which he had long suffered), he asked the train dispatcher to be relieved from duty, started to cry and the dispatcher "assumed he was all done." On July 14, there is evidence from two witnesses he was in a stupor, did not know what was going on and was unable to recognize his son, daughter-in-law or son-in-law.

The record in Hansen v. Waugh, supra, 237 Iowa 304, 21 N.W.2d 762, shows that the paragraph of the instruction (withdrawing the issue of testamentary capacity) there considered, preceding the portion quoted in the cited opinion, is substantially the same as the paragraph preceding the portion of instruction 3 hereinbefore quoted. The setting of the two paragraphs of the instructions in the two cases is identical. Further, the record and arguments in the Waugh case disclose that proponent urged in the trial court and this court the objection that the instruction left with the jury the impression "mental condition" referred to "mental weakness" which rendered testatrix susceptible to undue influence and there was no evidence of mental weakness. This is the objection the majority raises to instruction 3 here. Proponent's argument in the Waugh case upon this proposition cites the same decision (In re Will of Muhr, 218 Iowa 867, 256 N.W. 305) appellant has cited here. The majority decision sustains substantially the same contention that is rejected in Hansen v. Waugh and seems to be in direct conflict with the cited case.

Instruction 3 in Hansen v. Waugh, supra, was probably patterned after instruction 11 quoted in In re Estate of Eiker, supra (page 326 of 233 Iowa, page 324 of 6 N.W.2d), where the jury was told that although the issue of testamentary capacity was withdrawn, the evidence to show mental strength or weakness may be considered as bearing upon undue influence as charged. The Eiker opinion states (page 327): "We are satisfied that the evidence did tend to prove mental weakness. There was no issue of unsoundness of mind in the case. The issue withdrawn by the court was testamentary capacity. The terms are not synonymous. * * * There is no reversible error in this instruction."

In Shaw v. Duro, supra, 234 Iowa 778, 783, 784, 14 N.W.2d 241, 244, the issue of testamentary capacity was withdrawn, only undue influence was submitted to the jury. We said, "This court has frequently held * * * we may take into account the physical condition and strength of mind of a person whose will is under consideration. [Citations.]"

In In re Will of Soderland, 239 Iowa 569, 575, 30 N.W.2d 128, 131, the question of mental capacity was withdrawn from the jury, only undue influence was submitted. We said, "While the question of mental capacity was withdrawn by the court, the *mental condition* of the deceased has a bearing upon the question of undue influence." (Italics added.) Referring to an instruction, we state (page 584 of 239 Iowa, page 136 of 30 N.W.2d): "It fairly tells the jury the matters they can consider, such as the testator's state of mind * * * in determining whether or not the will was the product of undue influence." See also In re Estate of Telsrow, 237 Iowa 672, 677, 22 N.W.2d 792, 796, quoted from in the Soderland opinion, supra.

II. One of contestants' objections to probate of the will was that it was induced by proponent's fraud in leading testator to believe she was free to marry him. Proponent was divorced from her previous husband August 13, 1948. The decree provided "this judgment insofar as it determines the status of the parties * * * shall not become effective until one year from date * * *."

Instruction 3 states the issue of fraud has not been established, is withdrawn from the jury and they should consider it established that the will was not procured by fraud of proponent.

The instruction adds there was left in the case evidence introduced to show alleged false representations of proponent and such evidence may be considered as bearing upon the question of undue influence and as to whether it showed any acts of undue mental pressure or importunity by proponent against testator.

It must be admitted there is no direct evidence of false representations of proponent *to testator*. Instruction 3 does not say there was such evidence. While it is not clear what evidence the trial court had in mind by the above statement in instruction 3, apparently he felt there was evidence proponent had falsely represented to the clerk who issued the license for her to marry testator (on April 6, 1949) that she had not been divorced within a year. It is true the false affidavit so stating was signed by the attorney, Mr. Coon, but proponent was doubtless present at the time, had full knowledge of its falsity and took advantage of it.

While this portion of instruction 3 may be unfortunate and probably should have been omitted, since the issue of fraud was unequivocally withdrawn and there are no other errors, the part objected to hardly seems sufficiently prejudicial in itself to require a reversal. Only six lines of appellant's opening argument are devoted to argument on this proposition.

I would affirm.

WENNERSTRUM, C.J., joins in this dissent.