WORLD RADIO LABORATORIES, INC., A NEBRASKA CORPORATION, APPELLEE, V. COOPERS & LYBRAND, A PARTNERSHIP, APPELLANT.

538 N.W.2d 501

Filed September 12, 1995. No. A-93-739.

Jeff A. Anderson, of Kutak Rock, William G. Campbell, of Rogers & Wells, Philip A. Lacovara and Lynne M. Raimondo, of Mayer, Brown & Platt, and Maureen E. McGrath for appellant.

Joseph E. Jones and Michael L. Schleich, of Fraser, Stryker, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for appellee.

HANNON, IRWIN, and MUES, Judges.

HANNON, Judge.

In this action, World Radio Laboratories, Inc. (WR), sued Coopers & Lybrand (C & L), an accounting partnership, for professional malpractice in connection with the latter's audit of WR's financial statements for the fiscal years ending in the last week of May or first week of June in the years 1981 through 1984. WR alleges C & L was negligent in auditing WR's annual reports for those years because it did not discover a large account payable that was not listed on WR's balance sheets for 1981 through 1984 and because it failed to advise WR's

management that its accounting system did not contain adequate internal controls. The undiscovered payable was $890,111 at the time of C & L's last audit, which covered the fiscal year ending June 2, 1984. In spite of the claim that C & L's malpractice made WR insolvent, WR continued in business and made a profit for the years 1986 and 1987, but it suffered a loss in 1988 and filed for bankruptcy in 1989. In submitting the case to the jury, the court instructed it to determine the damages for each year separately. The jury awarded WR damages of $0 for 1981, $10,300 for 1982, $12,000 for 1983, and $17,018,000 for 1984.

C & L maintains that the statute of limitations bars recovery for 1982 and 1983 and that contributory negligence bars any recovery as a matter of law. C & L also assigns a myriad of alleged errors concerning damages. We conclude that neither the statute of limitations nor contributory negligence bars recovery as a matter of law and that the verdict of liability should be affirmed. We also conclude the jury was not properly instructed on the measure of damages and that the principal evidence relied upon by WR to establish significant damages is speculative and conjectural as a matter of law. We therefore affirm in part, in part reverse, and remand for a new trial on the issue of damages.

## BACKGROUND AND FACTS

Leo Meyerson started WR in 1935 and sold radio equipment and supplies to amateur radio operators by mail order. Larry Meyerson, Leo's son, joined the company in 1961. In 1967, the company opened its first retail store in Omaha. This store sold not only radios and electronic equipment and parts, but also hi-fi equipment and sound recordings. Later the company expanded into TV, video, stereo, and similar equipment. In 1984, the company began to sell extended warranties for the electronics equipment it sold. The company quit the mail-order business in 1970. By 1979, the company operated 10 stores. By January 1985, it operated 21 stores. At its peak in 1986, it operated 28 stores that were situated in various cities in Nebraska, Iowa, Missouri, Kansas, and Illinois. By 1980, sales were better than $8 million per year; by 1984, $25,839,043; and by 1987, $40,562,746.

During the first half of the 1980's, WR was a growing company that appeared to have excellent prospects for continued growth. Larry Meyerson owned more than 85 percent of the outstanding stock of WR and was its president, and his father was chairman of its board of directors, but did not attend meetings. Larry Meyerson hoped WR would have 50 stores by 1987. Toward that end, in 1979 he hired Joseph Riha, a C.P.A. who had worked for C & L, as the chief financial officer for WR. Riha became vice president and treasurer of WR and remained in charge of the accounting department until June 1985. In the early 1980's, Meyerson dreamed of "going public," that is, of offering WR stock to the public. By 1983, he mentioned the subject to C & L accountants. They introduced him to a man from New York, Tom Fitzpatrick, and in 1984 or late 1985, C & L arranged for Fitzpatrick to meet with Meyerson in Omaha concerning "going public." Fitzpatrick told Meyerson that when WR had approximately $2 million in net profits before taxes it could consider an initial public offering of its stock. Meyerson expected profits would be near that figure by June 1985. He wanted to sell WR stock to the public to raise money for expansion.

WR used 13 accounting periods per year, each with 4 weeks. Through 1985, WR's fiscal year ended in the last week in May or first week of June of each year. After 1985, the fiscal year was changed to end in the last week of January or first week of February. These practices resulted in WR's fiscal year ending on a slightly different date each year.

In the early 1980's, WR installed a computer system. This system did all of the company's accounting as well as inventory and sales reporting. The system automatically recorded every sale at all of the stores, determined the cost price of the item that was sold and subtracted it from the sale price, and computed the gross profit on each sale, or gross margin. The system produced on a daily basis the total figures of the gross sale price, the cost price, and the gross margin for all sales of all stores. This information was interfaced with the general ledger in the computer.

Part of WR's inventory was financed by a "floor plan." Under a floor plan system, the company selling products to a

retailer delivers the products to the retailer, but is paid by a financing company. When the company financing the floor plan pays the supplier, it sends a statement to the retailer. The retailer then pays the financing company according to the terms provided in an agreement between the retailer and the financing company. Usually the financing company obtains a discount from the supplier, and therefore, the retailer does not pay the financing company interest if it pays the financing company on time. When products are delivered under the floor plan, the financing company sends a notice, or invoice, to the retailer showing the merchandise delivered, its cost, and the date or dates by which the retailer must pay the financing company.

WR started financing its floor plan with Westinghouse Credit Corporation (WCC) in 1982. WCC became one of WR's largest creditors. During the fiscal year ending in June 1984, WR did $3 or $4 million of business with WCC. Most of the invoices sent by WCC allowed WR to pay the amount due on the invoice in more than one installment. Riha claimed the computer system could not handle invoices which contained multiple payment dates under the same invoice number, and therefore, the records of WR's account with WCC could not be kept on computer. Amazingly, in this day of computerization, WR kept track of its debt to WCC by putting the unpaid invoices in a special drawer in the desk of a particular accounting clerk. The clerk manually kept track of the dates when payments were required to be paid according to the invoices and manually prepared checks to pay WCC before each due date. Meyerson or Riha signed the checks. The debt to the General Electric Credit Corporation, the company that financed WR's floor plan before WCC, was handled in the same fashion.

The WCC payable was not automatically listed with the other accounts payable on the trial balance maintained by WR's computer accounting system. In order to reflect that debt on the balance sheet, someone would have needed to manually add the WCC debt to WR's liabilities and make an appropriate adjustment of the income statement. This was never done, and therefore, WR's balance sheets all showed total liabilities to be too low by the amount of the WCC payable and the profits for each year to be too high by the amount that the WCC obligation

increased during the particular accounting year. The financial statements that C & L audited and the monthly financial statements that Riha prepared and presented to Meyerson and the company's bank were simply wrong. As of the date of the last audit, June 2, 1984, the liability to WCC was $890,111.

C & L audited WR financial statements each year from 1970 through 1984. In addition, C & L accountants attended quarterly management meetings and consulted with Meyerson from time to time. C & L auditors did not locate the missing payable.

Apparently WR had no clouds on its horizon until May 21, 1985. Riha testified that on that date, he first discovered the WCC payable was not on the financial statements audited by C & L for the fiscal year ending June 2, 1984. Immediately, he told Meyerson. Meyerson immediately contacted his lawyer and another accountant. By May 23, 1985, C & L had agreed that the WCC liability had not been included as a payable in the June 1984 balance sheet. WR's banker was told of the problem, and Riha resigned a short time later.

Understandably, the management of WR faced severe problems upon learning of the missing account payable. In summary, WR's evidence showed that WR's management found it did not have a financial statement to present to its bank or to its suppliers. New manufacturers in particular required a current financial statement before selling merchandise. Thus, WR was unable to acquire new product lines. It was unable to advertise competitively. WR's bank required Meyerson to personally guarantee WR's loan at the bank. The bank would not extend the additional credit necessary to accommodate desired growth. Management was required to spend 14 to 15 hours per day coping with the problems, and employee morale decreased.

WR introduced much additional testimony to show how its financial condition prevented it from expanding or meeting competition head on, which it otherwise could have done, and thus encouraged its competitors to enter its markets. WR implies these handicaps ultimately caused its bankruptcy in 1989.

Arthur Young (AY), another national accounting firm, replaced C & L as WR's auditor shortly after the problem was

discovered. AY auditors reported they were unable to prepare an income statement for the fiscal year ending June 1, 1985, because WR's existing accounting system lacked adequate internal accounting controls.

By a letter dated April 10, 1986, AY formally reported to the stockholders of WR that the accounting system existing on June 1, 1985, and for several year prior thereto, lacked the internal controls necessary to safeguard assets, to ensure transactions were executed as authorized, and to permit the preparation of financial statements in accordance with generally accepted accounting principles (GAAP). This malpractice represents a substantial part of WR's claim against C & L, and WR claims this malpractice and the failure to discover the obligation to WCC combined to support WR's claims. For this reason, we summarize the report in some detail.

In summary, the AY report dated April 10, 1986, states WR's accounting procedures were deficient as follows: (1) Debts to WCC and its predecessor were not included in the general ledger or year-end or monthly reports, annual balance sheets were not reconciled to income statements, the system lacked financial reporting by store or special sales events, and Riha had access to the company computer system by his home computer; (2) the numerical order of sales invoices was not maintained or controlled, and items such as sales reports, rebates, and contract sales were not reconciled to the general ledger; (3) too many people had the ability to change inventory records; in the case of special sales held out of the stores, the merchandise was not inventoried before and after the sale and the inventories were not reconciled with the merchandise sold; the inventory was not integrated with sales and other reports; and while perpetual inventory records were adjusted to physical counts, no attempt was made to investigate the differences between the actual counts and the perpetual inventory; (4) accounts payable were not investigated and reconciled, payables could be removed from the "payable file," and receiving reports were uncontrolled; (5) numerical controls over checks were not maintained, bank accounts had not been reconciled in a timely manner, too many people had check-writing authority, and blank checks and voided checks were not controlled. The letter

indicated that many of the above matters had been corrected between June 1, 1985, and the date of the letter, but AY complained that the chief financial officer still had unlimited check–writing authority.

The record contains a great deal of testimony about these missing controls and the effect of their absence. Stanley Scott, a well–qualified C.P.A., testified as an expert on accounting standards. Scott's testimony is sufficient to support a finding that the auditor is responsible for discovering and then advising management on any deficiency in the accounting system concerning accounting controls. Scott testified that a material deficiency in such controls allows a risk or an error of such magnitude that it would adversely impact the financial statements of the company. The evidence establishes that GAAP require an auditor to discover and disclose missing controls to management and that C & L did not do so for at least the years 1982 through 1984. Scott opined C & L did not follow GAAP in auditing WR.

Luke Northwall, a C.P.A. who formerly worked for AY, started working for WR on June 25, 1985. He replaced Riha. Northwall testified that WR's management probably had the entire accounting system changed to comply with AY's recommendations by the fall of 1985. However, he testified that prior to this, an interstore transfer system would not prevent somebody from stealing. He felt the gross margin reports were accurate, but they should have been integrated with the general ledger. The cash systems would not safeguard company assets, and there were "weaknesses" in the key city funds, co–op advertising claims, and layaway and loaner policies.

Meyerson testified that he was not aware of these deficiencies in the company's accounting system until 1985, and upon learning of the need for change he set about to correct the system. If he had been advised of the need for a better system, he would have incorporated the changes immediately. Also, had he known about the WCC payable, he would not have paid bonuses.

After an inventory was completed on or about June 1, 1985, it was apparent that WR was insolvent. There was at least a $2.8 or $3 million decrease in inventory from that on the books

versus what was counted. By March 28, 1986, AY had prepared a balance sheet which shows that as of June 1, 1985, WR had assets of $9,929,528, liabilities of $10,177,692, and a negative net worth of $248,164. In order to obtain an income statement, AY prepared a financial statement for the short period from June 2, 1985, through February 1, 1986. The income statement showed a net income for that period of $1,224,663. That report showed the stockholders' equity had increased to $934,482 by February 1, 1986.

After AY closed its Omaha office, Peat Marwick audited WR for the fiscal year ending January 31, 1987. That report showed a net income of $1,229,782 for that year and that the stockholders' equity had increased to $2,157,594 as of January 31, 1987. The audit report for the year ending January 30, 1988, showed a loss of $1,529,659 and a stockholders' equity on that date of $346,809. In March 1988, the Meyerson family stock was redeemed, and Malcolm Ballinger and Northwall became the owners of WR. The company filed for bankruptcy on March 29, 1989.

## WR'S ALLEGATIONS OF DAMAGES

The operative petition was filed February 25, 1987, before the losses of 1988 and before the bankruptcy of 1989. In this petition, WR pled that C & L's negligence proximately caused it to be damaged in 15 various ways as specified in 15 subparagraphs. Mainly, the petition lists the problems and difficulties WR encountered as a result of its inability to prepare a financial statement, its limited capital, and its inability to obtain more capital, and the petition lists the business opportunities WR lost as a result of these difficulties. No value is pled for any of these alleged damages. The petition also contains allegations of incurred expenses for attorneys, accountants, and polygraph operators, as well as for overtime expense, bonuses paid, and profit-sharing contributions made, but no value is assigned to any of these items. It also contains allegations of lost discounts, lost rebates, and inventory losses suffered by WR and alleges that stockholders' equity and the value of the business are less than they would have been. No value is placed on any of the above items, but that section of the

petition ends with the allegation that WR has been damaged in the amount of $18,151,945.

## EVIDENCE OF DAMAGES

*Exhibit 180.*

Northwall testified to establish the foundation for exhibit 180. His testimony and this exhibit are the bases for WR's experts' testimony to establish damages. Northwall and other accountants testified that a financial statement for the year ending June 1, 1985, could not be prepared, because of the inadequate accounting controls existing before AY was retained as WR's accounting firm.

A balance sheet was prepared by AY for June 1, 1985, and an earnings statement was prepared by AY for the period from June 2, 1985, to February 1, 1986. The period contained 9 periods of 4 weeks each. Peat Marwick prepared an earnings statement for the next fiscal year ending January 31, 1987. For ease of expression, we will call this approximately 22-month period the 1986-87 period.

Northwall computed what percentage the expenses during the 1986-87 period bore to the gross sales during that period. For instance, he determined direct operating expenses during the 1986-87 period were 22.09 percent of the gross sales revenues during that same period. He found that during that period, the cost of merchandise sold was 69.73 percent of gross sales. He then assumed that the direct operating expenses and the various rebates, costs, and expenses for each of the years 1981 through 1984 would be the same percentage of gross sales for each respective year. He testified that he had confidence that the gross margin reports of 1983 through 1985 were substantially correct, that he used these, and that the figures he obtained for gross margin for 1981 and 1982 were accurate. In this way, he computed the net income for each of these years separately.

By this procedure, Northwall arrived at his opinion of what the net profit of WR both before and after taxes would have been had C & L not been negligent. The results of these computations are shown in the first two columns below. For comparison purposes, similar figures obtained from WR's actual annual financial statements are shown in the last two columns:

Earnings

| Year Ending | Northwall's Net Before Taxes | Northwall's Net After Taxes | WR Fin/St Net Before Taxes | WR Fin/St Net After Taxes |
|---|---|---|---|---|
| 5/30/81 | $ 641,296 | $ 320,648 | $ 111,084 | $ 90,084 |
| 5/29/82 | 538,131 | 269,066 | 31,726 | 33,926 |
| 5/28/83 | 906,721 | 453,360 | 349,441 | 239,441 |
| 6/2/84 | 1,072,770 | 536,385 | 584,110 | 376,140 |
| 6/1/85 | 1,380,615 | 690,307 | none available | |
| 2/1/86 | (short year) | | 1,360,734 | 1,309,834 |
| 1/31/87 | | | 1,537,487 | 825,687 |

Northwall added the net–income–after–taxes figure he obtained for each year to stockholders' equity shown on the balance sheet that C & L had prepared for May 31, 1980. By this method, Northwall computed what he opined to be the stockholders' equity of WR at the end of each fiscal year from 1982 through 1985, if C & L had not been negligent. The results of these computations are shown in the first column in the table below. For comparison purposes, we have shown the value of stockholders' equity as shown on the actual financial statements of WR, together with a note as to which accounting firm prepared the particular financial statement:

Stockholders' Equity

| Year Ending | From Ex. 180 | From WR's Records | Audited by |
|---|---|---|---|
| 5/31/80 | | $ 790,691 | C & L |
| 5/30/81 | $1,118,941 | 888,647 | C & L |
| 5/29/82 | 1,389,581 | 924,147 | C & L |
| 5/28/83 | 1,858,380 | 1,179,027 | C & L |
| 6/2/84 | 2,416,798 | 1,555,170 | C & L |
| 6/1/85 | 3,138,293 | none available | |
| 2/1/86 | | 934,482 | AY |
| 1/31/87 | | 2,157,594 · | Peat M |
| 1/30/88 | | 346,809 | Peat M |

WR's expert on value, Laurie Shahon, relied directly upon Northwall's opinion that WR should have had a net profit for

the fiscal year ending on June 1, 1985, of $690,307, although she testified she was aware of the other information contained on exhibit 180, but she did not explain any significance it might have had.

*Shahon's Opinion.*

Shahon, an investment banker working out of New York, testified for WR on the value of WR as of May/June 1985. Her qualifications as an investment banker to testify on the value of WR, as distinguished from the factual bases upon which her testimony was based, are not questioned. We therefore will not detail her education or experience other than to say that she appears to have extensive experience working with private corporations "going public." She explained that for a company "to go public," the company sells stock to the public and creates a market where the stock can be bought and sold publicly. She also had experience in this field with companies that were in the business of retail sales of electronics equipment "going public." WR retained her to give her opinion on the value of WR.

As background for her testimony, Shahon gathered public information on seven consumer electronics companies that had "gone public" as of early 1985, such as Audio/Video Affiliates, Inc.; Best Buy Co., Inc.; Circuit City Stores, Inc.; et cetera. These companies operated stores in different parts of the United States. She testified to extensive investigation of the capital structure and other aspects of each of these companies that were available publicly. She testified on the different aspects of these companies, their varying debt–to–asset ratios, et cetera. She made no attempt to correlate this information with reference to the price/earnings ratios she collected and relied upon for her opinion. She made no attempt to explain or to depreciate the difference between the differing price/earnings ratios for the various companies or for the variation of the ratios for one company from one month to the next. She determined that the price/earnings ratios of five companies were relevant to a determination of the price/earnings ratios of WR, and she compiled the price/earnings ratios of these companies for each month from January through May 1985. These price/earnings ratios varied for each month for each company, and they were

as high as 20.38 and as low as 11.11.

She testified that she was asked to value WR for the May/June period of 1985 as if WR "Exhibit 180 had been the case." She testified that "assuming the numbers contained on Exhibit 180" had been the case, "World Radio was worth between 8 and 11 million dollars." She also testified that the value of WR under the situation in which it actually found itself in June 1985 as disclosed by its balance sheet showing a $250,000 negative net worth was "virtually worthless."

Shahon testified that she based her opinion on WR's value from exhibit 180 and upon her determination that companies such as WR would have a price/earnings ratio in the range of 11:1 to 16:1, that is, the value of its stock would be from 11 to 16 times its annual earnings rate. Exhibit 180 showed the earnings for the year ending June 1, 1985, to be $690,307. She used $700,000 and multiplied that figure by 11 and 16 and arrived at values of $7,700,000 to $11,200,000. There is no other expert testimony showing a loss in WR's profits or the value of its capital.

There is evidence which shows that WR paid fees to C & L for auditing of $13,000, $14,000, and $15,000 for 1982, 1983, and 1984, respectively. In addition, for the same years, WR paid nonauditing fees of $4,232, $10,207, and $10,920, respectively. There is also evidence that WR paid $94,810.50 to AY for auditing services it performed after June 1, 1985, but this amount appears to include $5,000 for services to Meyerson personally and for other services that do not appear to be caused by the negligence of C & L.

Meyerson, Northwall, and other witnesses also testified to the problems, difficulties, and lost opportunities that WR's management encountered between the discovery of the problem and bankruptcy, but no attempt was made to place a dollar value on these matters. WR's arguments both before the jury and before this court establish that WR relies upon Northwall's and Shahon's testimony to establish damages.

*Jury Instructions.*

In instruction No. 18, the court instructed the jury that it "must fix the amount of money which will fairly and fully

compensate the plaintiff for its loss proximately caused by the alleged negligence of the defendant." Instruction No. 18 also told the jury that the law recognizes only compensatory damages and that the award of damages must be based upon evidence, not speculation, guess, or conjecture, and not be influenced by prejudice or sympathy. In addition, the court gave instruction No. 19, which stated the following:

The plaintiff seeks damages in the form of lost profits by claiming that the negligent conduct of the defendant prevented its established business from earning profits. In order to do so, the plaintiff has the burden of proving by the greater weight of the evidence: (1) that it is reasonably certain that such profits would have been realized except for the negligence, and (2) that the lost profits can be ascertained and measured from the evidence with reasonable certainty.

While lost profits need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural. The evidence must show with reasonable certainty both that such damages did, in fact, occur and the extent of those damages.

The court gave no other instructions on damages. Thus, the only element of damages upon which the court instructed the jury was that of lost profits.

## ASSIGNMENTS OF ERROR

C & L assigns 12 errors. Space limitations require that these assignments be organized and simplified. In summary, C & L alleges the trial court erred (1) by not holding the statute of limitations barred recovery for the years 1982 and 1983 and (2) by not holding contributory negligence barred recovery as a matter of law. The remainder of the assignments of error are concerned with damages, which will be explained in the damages section of this opinion.

## STANDARD OF REVIEW

A jury verdict will not be set aside unless clearly wrong, and it is sufficient if there is any evidence presented to the jury upon which it could find for the successful party. *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993);

*Bartunek v. Geo. A. Hormel & Co.*, 2 Neb. App. 598, 513 N.W.2d 545 (1994). " 'The question of the amount of damage is one solely for the jury and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of injury and damage proved.' " *American Tel. & Tel. Corp. v. Thompson*, 193 Neb. 327, 330, 227 N.W.2d 7, 9 (1975) (quoting *Van Wye v. Wagner*, 163 Neb. 205, 79 N.W.2d 281 (1956)). As to questions of law, an appellate court has an obligation to reach a conclusion independent from a trial court's conclusion in a judgment under review. *George Rose & Sons v. Nebraska Dept. of Revenue*, 248 Neb. 92, 532 N.W.2d 18 (1995); *Unland v. City of Lincoln*, 247 Neb. 837, 530 N.W.2d 624 (1995).

## STATUTE OF LIMITATIONS

The jury awarded no damages for 1981, and C & L claims recovery for any malpractice that might have occurred in 1982 and 1983 is barred by the statute of limitations. The jury award for these years is insignificant when compared to the verdict for 1984, but C & L argues that the improper submission of these years had an adverse effect on the award for the following year.

Neb. Rev. Stat. § 25-222 (Reissue 1989) provides claims for professional negligence shall be brought within 2 years after the alleged act, omission, or failure to render the professional service. Unless there is some circumstance changing the rule, the statute of limitations on any error committed in an audit begins to run when the audit report is delivered to the client. *Lincoln Grain v. Coopers & Lybrand*, 215 Neb. 289, 338 N.W.2d 594 (1983). The audit report for the fiscal year ending in 1982 was mailed on October 5, 1982, and the report for the next year was mailed on August 5, 1983. This action was filed on May 20, 1986. The statute of limitations has run on these years unless it is extended on some recognized basis.

Section 25-222 also provides: "[I]f the cause of action is not discovered and could not be reasonably discovered within such two-year period, then the action may be commenced within one year from the date of such discovery or from the date of discovery of facts which would reasonably lead to such discovery . . . ."

■ The issue was separately tried by the court under Neb. Rev. Stat. § 25-221 (Reissue 1989), and the court made a general finding that the statute of limitations did not bar recovery. If there is no dispute on the facts, the determination of when a statute of limitations begins to run is a question of law for the court. *Norfolk Iron & Metal v. Behnke*, 230 Neb. 414, 432 N.W.2d 18 (1988); *Tiwald v. Dewey*, 221 Neb. 547, 378 N.W.2d 671 (1985). However, when the facts are in dispute on that issue, the finding of the trial court will not be set aside unless clearly wrong. *Norfolk Iron & Metal, supra.*

■ The evidence shows that on May 21, 1985, Riha and Meyerson suspected and perhaps learned that C & L had failed to discover that the WCC payable was not on the audited financial statement for 1984 and possibly for the earlier years. Discovery under § 25-222 means " ' " 'notice of facts which would lead an ordinarily prudent man to make an examination which, if made, would disclose the existence of other facts is sufficient notice of such other facts.' " ' " *Norfolk Iron & Metal*, 230 Neb. at 422, 432 N.W.2d at 23 (citing *Baxter v. National Mtg. Loan Co.*, 128 Neb. 537, 259 N.W. 630 (1935)). The evidence clearly would support a finding that Riha and Meyerson did not know about this matter before May 21, 1985. The transcript shows the petition was filed on May 20, 1986, which is within 1 year after Meyerson learned of the problem.

With regard to the negligent failure to advise WR's management of the lack of adequate internal accounting controls, the record would support a finding that WR's management did not know about this negligence until after it learned of the other problem, and therefore, recovery of any damages for this negligence is likewise not barred.

C & L argues that circumstantial evidence establishes that Riha and Meyerson had knowledge of facts which should have put them on notice before May 21, 1985, and that this knowledge on the part of Riha and Meyerson would have put WR on notice before May 21, 1985, insofar as the statute of limitations is concerned. On this basis, C & L argues the statute of limitations prevents recovery. If the evidence would support such a conclusion, the trial judge did not accept this interpretation, and of course, in the later trial, the jury did not

accept it. Whether the knowledge possessed by these corporate officers would have constituted an earlier discovery for purposes of the statute of limitations as a matter of law raises the same basic question as to whether such knowledge required a finding that WR was contributorily negligent as a matter of law. We shall consider that question in the next section of this opinion, and we conclude that it does not.

We conclude the trial court was not clearly wrong in holding the statute of limitations did not bar WR's action for 1982 and 1983.

## CONTRIBUTORY NEGLIGENCE

C & L does not dispute the correctness of the jury's finding that it was negligent. However, it argues that recovery is nonetheless precluded by contributory negligence. C & L alleges that the corporate officers, namely Riha and Meyerson, either knew the WCC payable existed and deliberately hid that fact from C & L or should have known it existed, and therefore, WR was contributorily negligent as a matter of law. Both Riha and Meyerson denied they knew that the WCC payable was not included within the audited financial statement. There is no evidence that would require a finding as a matter of law that Meyerson knew or should have known that the WCC liability was not included in the financial statements.

The evidence shows that Riha set up the system in which the records of the debt to WCC were kept in a desk drawer. He knew this debt was not contained on the list maintained on computer. He prepared a monthly financial statement by hand, and the evidence shows that he did not add the WCC account payable to the liabilities on the balance sheets that he prepared monthly. He would necessarily have obtained the accounts payable list from the computer, and he offered no explanation of why he did not realize this list did not contain the account which he claimed he determined could not be put on computer. His explanation was "I blew it. I mean I missed it." This is an admission that he was negligent.

Evidence of contributory negligence of a client in the case of malpractice of an accountant auditing a company's books has a definite limit because of the nature of an auditor's task.

"[T]he contributory negligence of the client is a defense only where it has contributed to the accountant's failure to perform the contract and to report the truth." *Lincoln Grain v. Coopers & Lybrand*, 216 Neb. 433, 442, 345 N.W.2d 300, 307 (1984). In the case at hand, Riha's failure to realize that the WCC payable was not on the financial statements is clearly negligence, but whether that negligence contributed to C & L's failure to perform its duty to find and to report the truth is a question of fact for the jury. See *id.*

Riha was the chief financial officer of WR. As observed by the Michigan Court of Appeals, "It is clear that an audit of an institution's financial records serves, at least in part, as a check on the authority and expertise of the institution's own financial personnel." *Harper v Inkster Pub Sch*, 158 Mich. App. 456, 461, 404 N.W.2d 776, 778 (1987). A large part of the function of the audit by C & L was necessarily to check on the system Riha was managing. Riha would naturally be responsible for any mismanagement of accounting functions of WR, and to hold that a corporation was bound by such an officer's negligence would defeat a large part of the purpose of an audit.

Riha's conduct in this connection would probably support a finding that he knew the payable was not on the balance sheet and deliberately chose to hide it. Even Meyerson conducted an investigation to ascertain if Riha was guilty of some sort of malfeasance, and found none. Even assuming Riha hid the WCC debt, there is no suggestion that he did so for a corporate purpose, as opposed to an individual purpose.

C & L seeks to attribute Riha's knowledge of the missing payable to the corporation. The general rule is that agents are conclusively presumed to have performed their duty to communicate facts concerning their agency to their principal. *City of Gering v. Smith Co.*, 215 Neb. 174, 337 N.W.2d 747 (1983). However, " '[a] corporation is not chargeable with the knowledge nor bound by the acts of one of its officers in a matter in which he acts in behalf of his own interests, and deals with the corporation as a private individual, and in no way represents it in the transaction.' " *Scottsbluff Nat. Bank v. Blue J Feeds, Inc.*, 156 Neb. 65, 82, 54 N.W.2d 392, 403 (1952)

(quoting *Koehler v. Dodge*, 31 Neb. 328, 47 N.W. 913 (1891)).

This notion has been applied to the attribution of the knowledge of a corporate officer in audit situations where the corporate officer would be guilty of fraud. *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 114 S. Ct. 2048, 129 L. Ed. 2d 67 (1994) (the Court held this rule is governed by state law, but the state's rule in the case was not discussed in detail); *F.D.I.C. v. Ernst & Young*, 967 F.2d 166 (5th Cir. 1992); *Comeau v. Rupp*, 810 F. Supp. 1127 (D. Kan. 1992). In summary, we think the rule is that the failure of a corporate officer to disclose information to an auditor is not attributed to the corporation as a matter of law when the corporate officer's failure to disclose the information was not for a corporate purpose. Riha's failure to inform C & L of the existence of the payable may have been done for some personal reasons, i.e., to protect his job; however, there is no evidence that would require a finding it was done for a corporate purpose.

We therefore conclude that WR was not contributorily negligent as a matter of law so as to prevent recovery against C & L for its negligence. However, we do not conclude the reverse, that is, that the evidence would not support a finding of contributory negligence sufficient to decrease recovery under the comparative negligence doctrine.

## INSTRUCTING JURY ON DAMAGES

The court instructed the jury only on the measure of damages under the theory of lost profits. Shahon testified that she was asked to value WR "assuming the numbers contained on Exhibit 180." She does not pretend to predict lost profits, but, rather, gives an opinion on value. The end result of Northwall's opinion contained in exhibit 180 is based upon his opinion of the amount of profits WR would have had without C & L's negligence. The end result of WR's evidence on damages does not appear to be lost profits, but, rather, an opinion of the value of a theoretical corporation at a certain time, June 1, 1985. We must first determine what are "lost profits" and therefore whether the court properly instructed the jury on the issues raised by the evidence.

*Meaning of Lost Profits.*

■■■ " 'Profits are the net pecuniary gain from a transaction, the gross pecuniary gains diminished by the cost of obtaining them.' " *King Features Synd. v. Courrier*, 241 Iowa 870, 882, 43 N.W.2d 718, 726 (1950) (quoting Restatement of Contracts § 331, comment *b.* (1932)).

Black's Law Dictionary 1211 (6th ed. 1990) defines profit in part as follows:

> Most commonly, the gross proceeds of a business transaction less the costs of the transaction; *i.e.* net proceeds. Excess of revenues over expenses for a transaction; sometimes used synonymously with net income for the period. Gain realized from business or investment over and above expenditures.
>
> Profit means accession of good, valuable results, useful consequences, avail, gain, as an office of profit, excess of returns over expenditures or excess of income over expenditure. ·

Webster's Encyclopedic Unabridged Dictionary of the English Language 1149 (1989) defines profit in part as follows:

> 1. Often, **profits.** *Econ.* **a.** pecuniary gain resulting from the employment of capital in any transaction. Cf. **gross profit, net profit. b.** the ratio of such pecuniary gain to the amount of capital invested. **c.** returns, proceeds, or revenue, as from property or investments. **2.** the monetary surplus left to a producer or employer after deducting wages, rent, cost of raw materials, etc.

We note that Northwall did give an opinion of the excess of revenues over expenses for each of the years 1981 though 1985, and it could be argued that such was evidence of the profits WR lost for each of these years. However, the jury did not award any significant damages for any year except 1984. In that year, Northwall opined, WR would have had net income of $536,385, and the verdict for 1984 was $17,018,000. Northwall testified that the total profits that WR would have made during the 5 years from 1981 through 1985 had C & L not been negligent was $2,269,766. He made no attempt to testify to the amount of profits WR actually made during any of these years. Furthermore, in both this court and before the jury, WR's

counsel supports the verdict recovery upon Shahon's opinion, not Northwall's. WR places no significance on Northwall's opinions on profits, except that they provide the basis for Shahon's opinion of value.

The combined expert opinions of Northwall and Shahon establish the value WR would have had if C & L had not been negligent as alleged. This theory of damages has nothing to do with lost profits. It is essentially a "before and after" or a "with or without" theory of damages which is commonly used when property is damaged by a tort.

*Duty of Trial Court.*

The court only instructed upon the general right of WR to recover such damages as it sustained, and upon lost profits when, as we have concluded above, there was insufficient evidence of lost profits. The record shows that neither party objected to the instruction given by the court or offered any jury instruction on the measure of damages.

"It is the duty of the court, on its own motion, to instruct on all material issues raised by the pleadings and evidence. The jury should have been told the manner in which the damages sustained by the plaintiff are to be measured and arrived at." *Ranchland Auto, Inc. v. Cleveland*, 188 Neb. 804, 805, 199 N.W.2d 702, 703 (1972). "Whether requested to do so or not, the trial court has the duty of instructing the jury on issues presented by the pleadings and the evidence." *Worth v. Schillereff*, 233 Neb. 628, 630, 447 N.W.2d 480, 483 (1989). In *Omaha Mining Co. v. First Nat. Bank*, 226 Neb. 743, 415 N.W.2d 111 (1987), the trial court instructed only on the plaintiffs' general right to recover all damages sustained, and neither party objected to the instruction. The *Omaha Mining Co.* court affirmed the granting of a new trial on the issue of damages, saying the trial court is under a duty to correctly instruct on the law.

" 'It is the duty of the District Court to refrain from submitting to the jury the issue of damages where the evidence is such that it cannot determine that issue without indulging in speculation and conjecture.' " *El Fredo Pizza, Inc. v. Roto–Flex Oven Co.*, 199 Neb. 697, 704, 261 N.W.2d 358, 363 (1978)

(quoting *Shotkoski v. Standard Chemical Manuf. Co.*, 195 Neb. 22, 237 N.W.2d 92 (1975)). See, also, *Quad–States, Inc. v. Vande Mheen*, 220 Neb. 161, 368 N.W.2d 795 (1985); *Midlands Transp. Co. v. Apple Lines, Inc.*, 188 Neb. 435, 197 N.W.2d 646 (1972). " 'Notwithstanding absence of a request for a specific instruction, a trial court must instruct a jury on material or relevant issues presented by the pleadings and supported by the evidence.' " *McDermott v. Platte Cty. Ag. Socy.*, 245 Neb. 698, 706, 515 N.W.2d 121, 127 (1994) (quoting *Anderson v. Union Pacific RR. Co.*, 229 Neb. 321, 426 N.W.2d 518 (1988)).

 There is also a general rule that " '[w]here a certain theory as to the measure of damages is relied upon by the parties to the trial as the proper one, it will be adhered to on appeal whether it is correct or not.' " *Third Party Software v. Tesar Meats*, 226 Neb. 628, 631, 414 N.W.2d 244, 246 (1987) (quoting *Baum v. County of Scotts Bluff*, 169 Neb. 816, 101 N.W.2d 455 (1960), and citing *Smith v. Erftmier*, 210 Neb. 486, 315 N.W.2d 445 (1982)). In *Beveridge v. Miller–Binder, Inc.*, 177 Neb. 734, 131 N.W.2d 155 (1964), the plaintiff relied on this rule, but the record showed the defendant had moved for a directed verdict. The *Beveridge* court held that where the measure of damages had been challenged by objections to the pleadings or evidence, or by motion for a directed verdict or by the tendering of an instruction, the above rule that the theory of damages relied upon by the parties at trial will be accepted does not apply.

In this case, C & L did not object to the jury instruction. Prior to the trial, C & L filed a motion in limine in which it alleged the document that was later introduced as exhibit 180 "does not establish the <u>fact</u> that WR sustained <u>any</u> damage in the form of lost profits, nor does it provide any reasonable basis for calculating such damages. Plaintiff should be precluded from offering Exhibit [180] and from offering any testimony concerning the method of calculation of damages used therein . . . ." The motion was overruled, and at trial C & L did object to the introduction of exhibit 180. Counsel combined his argument with his objection, and he never explicitly stated that he objected to the evidence because it was on a theory different

than that which WR pled. In summary, he objected on the grounds that the information contained in the exhibit was speculative and conjectural, irrelevant, and immaterial. The record shows that C & L maintained exhibit 180 was not proper proof of lost profits. In admitting the exhibit, the trial judge commented that without the exhibit, WR "can't prove their case."

In addition, at the close of WR's evidence C & L moved for a directed verdict, and among the reasons stated for that motion was that WR had produced no evidence that any damages were proximately caused by the alleged negligence, and as a matter of law the court should determine the jury could not consider the alleged damages.

We conclude that the record shows C & L did not accept the measure of damages embraced by WR's evidence as the proper measure of damages in this case and made its position known. Accordingly, the trial court's obligation to correctly instruct the jury on the correct measure of damages applies.

The court instructed the jury only upon the theory of damages for lost profits, and as explained above, the evidence does not support submission of lost profits to the jury. The jury instructions did not tell the jury the manner in which any other damages sustained by WR were to be measured under the evidence, and this failure is reversible error.

## SUFFICIENCY OF EVIDENCE ON DAMAGES

In order to recover for legal malpractice, the plaintiff must prove (1) duty, (2) breach of duty, (3) proximate cause, and (4) resulting damages. *Earth Science Labs. v. Adkins & Wondra, P.C.*, 246 Neb. 798, 523 N.W.2d 254 (1994). While the Nebraska Supreme Court has not expressly stated so, "Accountants are held to the same standard of reasonable care as lawyers, doctors, architects, and other professional people engaged in furnishing skilled services for compensation." *Vernon J. Rockler & Co. v. Glickman, Etc.*, 273 N.W.2d 647, 650 (Minn. 1978). C & L argues that the trial judge should have granted it a directed verdict on the damages issue. A directed verdict may be granted on the issue of damages if the plaintiff fails to prove any damages. See *Nebraska Truck Serv. v. U.S.*

*Fire Ins. Co.*, 213 Neb. 755, 331 N.W.2d 266 (1983). We therefore must determine the general sufficiency of WR's evidence to support a verdict on any theory or element of damages, assuming the jury was properly instructed on the issue.

*Sufficiency of Northwall–Shahon Opinion.*

■ While the measure of damages under the Northwall–Shahon approach is not lost profits, their opinion on the value of the company is necessarily based upon an estimate of lost profits. The sufficiency of exhibit 180 must be tested by the same rules that are applicable to test direct evidence on lost profits. A review of the authority on that issue will be helpful.

The rule that lost profits from a business are too speculative and conjectural to permit the recovery of damages therefor, however, "is not a hard and fast one, and loss of prospective profits may nevertheless be recovered if the evidence shows with reasonable certainty *both* their *occurrence* and the *extent* thereof. . . . Uncertainty as to the *fact* of whether any damages were sustained at all is fatal to recovery, but uncertainty as to the *amount* is not."

(Emphasis in original.) *El Fredo Pizza, Inc. v. Roto-Flex Oven Co.*, 199 Neb. 697, 705, 261 N.W.2d 358, 363–64 (1978) (quoting *Fisher v. Hampton*, 44 Cal. App. 3d 741, 118 Cal. Rptr. 811 (1975)).

■ "[W]e stated that the plaintiff must plead and prove damages . . . . Further, the plaintiff's burden of proof cannot be sustained *by evidence which is speculative and conjectural.*" (Emphasis in original.) *III Lounge, Inc. v. Gaines*, 227 Neb. 585, 593, 419 N.W.2d 143, 148 (1988).

In *III Lounge, Inc.*, the court held some of the evidence on damages was a projection coupled with an assumption and was therefore unrealistic, speculative, and lacking the general certainty required as a basis for assessment of damages.

■ "[A] claim for lost profits must be supported by some financial data which permit an estimate of the actual loss to be made with reasonable certitude and exactness." *Quad-States, Inc. v. Vande Mheen*, 220 Neb. 161, 165, 368 N.W.2d 795, 798 (1985).

In *Katskee v. Nevada Bob's Golf of Neb.*, 238 Neb. 654, 472 N.W.2d 372 (1991), an expert testified on lost profits due to the defendant not being permitted to expand its store into adjacent space. The expert determined the yearly revenue per square foot at the location to which the store moved and multiplied that figure by the square footage of the adjacent space. He then multiplied the result of this arithmetic by the gross profit margin and subtracted therefrom his estimate of additional expenses incident to the increased space. He then divided that figure by 12 to obtain what he designated as lost profits per month, and that figure was then multiplied by the number of months to obtain the total loss. The court observed the expert assumed the only difference between the two locations was square footage, that he used sales figures from a different time period, that no studies were made to establish whether there was any change due to these differences, and that he did not evaluate whether there was a change in the number of competitors or consumer interest in the products. The court determined this witness' figures were "mere speculation and conjecture." *Id.* at 663, 472 N.W.2d at 380.

In *Katskee*, the defendant also called a person with a degree in corporate finance and many years in operating sporting goods stores who opined that Nevada Bob's lost $130,000. He based this opinion on his experience, his investigation of the corporate records, the substantial similarity between the two locations, and discussions with other store operators. He opined the store had an identical customer base. The court concluded his testimony was speculative and conjectural.

In *Buell, Winter, Mousel & Assoc. v. Olmsted & Perry*, 227 Neb. 770, 420 N.W.2d 280 (1988), engineers had breached their employment contracts with the plaintiff by leaving and then competing with the plaintiff. The plaintiff sought to prove damages with an expert witness and by proving the gross earnings of the engineers that had left the firm and multiplying that figure by the percentage that the plaintiff's net profit bore to its gross earnings. The Supreme Court cited many of the same cases we have quoted above and concluded the plaintiff had completely failed to prove damages.

" 'Where it has been proved that damage has resulted

and the only uncertainty is as to the exact amount, it is sufficient if the record shows "data from which the extent of the injury . . . can be ascertained with reasonable certainty . . . . Data for an exact calculation is not necessary." . . .' " *Colvin v. Powell & Co., Inc.*, 163 Neb. 112, 134, 77 N.W.2d 900, 914–15 (1956) (quoting *Jaeger v. Hackert*, 241 Iowa 379, 41 N.W.2d 42 (1950)). See, also, *Delp v. Laier*, 205 Neb. 417, 288 N.W.2d 265 (1980).

The most identifiable act of negligence on the part of C & L was its failure to discover the huge account payable to WCC. C & L did not create that liability and is not responsible for it or the consequences of its existence as distinguished from the consequences of WR's management not knowing the true picture of the company's debts. A close reading of the missing internal accounting controls shows that all the deficiencies relate to preventing the disappearance of assets and procedures to discourage employee theft or to catch them if they do steal. There is some evidence that when AY inventoried WR's assets and compared that inventory with the perpetual inventory at the time, there was approximately $3 million in missing inventory. The evidence also shows that WR had always taken physical inventory and compared it with the perpetual inventory. Evidence of the missing inventory was not developed in spite of WR's counsel's argument on appeal on the subject. However, even assuming that WR was missing approximately $3 million in inventory in June 1985, there is no evidence that would support a finding that C & L was responsible for that deficiency because it failed to advise WR's management of additional accounting controls which should have been used. Understandably, WR·did not rely upon this evidence to establish damages.

Scott, an experienced accountant, testified that the methodology used in exhibit 180 is "typically relied on by accountants and others." This is far different from an opinion that such a methodology produces a fair and reasonable prediction of the earnings WR would have had if C & L had found the overlooked payable to WCC and advised WR's management of the proper internal accounting controls.

The question is whether exhibit 180 is based upon

speculation and conjecture. Northwall's estimates are based upon profits made during a period that was $1^1/_2$ to $2^1/_2$ years after the end of the 5-year period for which he seeks to estimate possible earnings. There is no evidence to support his assertion that expenses for each year would be the same percentage of gross sales. No attempt was made to confirm his assumption by reference to actual expenses in the years 1981 through 1985 or to prove by any independent data that the relationship of such expenses to gross sales does remain constant.

Furthermore, the accounting controls that Northwall claimed make WR's actual records unreliable all relate to the protection of assets. On cross-examination, Northwall stated that his largest concern with the accounting controls at the store level was that there was no guarantee that every sales ticket written up by a sales clerk was entered into the computer. There is no evidence that those accounting controls would have decreased labor, rent, electricity, and other expenses or increased profits. In considering this matter, it must be remembered that WR actually kept the books, and there is no evidence which would support a conclusion that these books contained a gross understatement of the company's expenses over a 5-year period. The evidence really established that profits shown on the financial statements for the years 1982 through 1984 were too high by at least the amount of the WCC payable.

Northwall's opinion is based upon the assumption that the margin of profits in relation to sales for each year remained the same as WR grew from 10 stores in 1981 to 22 stores in fiscal 1985 and 28 stores by 1986. In *Katskee v. Nevada Bob's Golf of Neb.*, 238 Neb. 654, 472 N.W.2d 372 (1991), the experts assumed substantial similarity between businesses in two different locations, and this was held to be inadequate. In *Buell, Winter, Mousel & Assoc. v. Olmsted & Perry*, 227 Neb. 770, 420 N.W.2d 280 (1988), the Supreme Court held that damages could not be established by proving two engineers' gross earnings and deducting the percentage that the plaintiff's expenses bore to its gross revenues.

Northwall chose not to use the figures for 1988 and 1989, but chose to use 1986 and 1987. Some evidence shows the years 1986 and 1987 were not the same as 1981 through 1985 because

of definite management decisions. For example, Meyerson testified that in August 1984, they realized they had too much inventory in almost every area, and they worked diligently to reduce it and did so. Northwall testified that in June 1985 a decision was made to reduce inventory by $1 million and turn it into cash. The reduction was part of his survival plan to allow WR to survive through the Christmas season of 1985. This created cash and reduced inventory costs, but reduced sales because of less merchandise to sell.

WR did not own the buildings used by its stores, and the rent expense was significant. However, two buildings were owned by Meyerson personally. To cut expenses, WR paid Meyerson's mortgage payments on these two buildings rather than rent and made up the shortage later. This saved WR approximately $1,000 per month in 1985 on one of the buildings owned by Meyerson.

Northwall testified that during the 1986–87 period the company was in dire straits and the company took some cost–cutting measures: "We tried to cut corners as much as we could and operate as efficiently as we could to save cash." When asked if these cost–cutting procedures, "in light of all the other changes, have a material effect on the numbers you've reconstructed here," he answered no. He testified that he did not know whether the company paid fewer bonuses in the 1986–87 period. There is no evidence of the amount of the bonuses in the 1986–87 period, but in 1984 WR paid bonuses totaling $302,262.80 to eight managers ($200,000 of which was paid to Meyerson). There were also substantial contributions to profit sharing. In this connection, the interest is not in whether bonuses or profit–sharing contributions were or were not justified, but whether they were the same percentage of the gross margin for each of the other years. The record does not show they were the same.

Meyerson hired Malcolm Ballinger in 1984 as a step in merchandising and marketing television and video products along with extended warranties, that is, a warranty sold separately from the product that extended the warranty beyond the manufacturer's warranty. Northwall agreed the same management was not in effect in 1981 through 1984. The mix

of products also changed over time. Meyerson testified that the industry was still "skyrocketing" in the 1986–87 period as it had been doing in 1985, but there is no evidence that quantifies that rate of growth over these years. There was a different number of stores in 1984 as compared to 1986–87, and different markets. A controller and accounting personnel were added, and one person in accounting was let go. WR also rented less desirable buildings to conduct business.

Productwise, consumer electronics versus appliances changed over this period. The key city funds, rebates from suppliers, were negotiated, and Northwall did not know the terms of the agreements for the years 1981 through 1985. He had no way to compare the key city funds for the two periods.

Northwall's opinion in this case suffers from a weakness similar to that of the State's expert in *Y Motel, Inc. v. State*, 193 Neb. 526, 227 N.W.2d 869 (1975). In *Y Motel, Inc.*, the State's expert was prepared to testify on the value of a motel by capitalizing the "typical income" and "typical expenses" of similar operations, and the trial court's refusal to accept such evidence was affirmed. In so doing, the Supreme Court said: "To permit a person, even a qualified one, to appraise a tract of land on the basis of capitalization of income by an estimate of the operation of a typical business would be guesswork at every stage." *Id.* at 533, 227 N.W.2d at 874. In this case, Shahon is merely capitalizing Northwall's guesswork, and such evidence is not adequate proof of damages.

We conclude that the facts set forth in the preceding discussion make Shahon's opinion insufficient as a matter of law to support an award of damages.

*Other Possible Damages.*

The parties stipulated that WR paid fees to C & L for auditing in the sums of $13,000, $14,000, and $15,000 for 1982, 1983, and 1984, respectively. In addition, for the same years, WR paid nonauditing fees of $4,232, $10,207, and $10,920, respectively. The trial court did not instruct the jury that WR could recover all or any part of these fees. At final argument, WR's counsel argued the full amount of the fees should be awarded as damages because none of the audits were

any good "when the financial statements aren't any good." If there is any evidence establishing the correctness of counsel's statement, we have missed it.

▮ The rule appears to be:

> While minor inaccuracies in an audit or report may be overlooked, where by reason of the accountant's negligence, inaccuracies and failure to report facts of serious character appear, he or she is not entitled to compensation. And when compensation is paid to an accountant in reliance upon his or her report, it may be recovered, upon proof that through the accountant's negligence, the audit was in substance, false.

1 Am. Jur. 2d *Accountants* § 13 at 537 (1994). See, also, 1 C.J.S. *Accountants* § 15 (1985); *Ryan v. Kanne,* 170 N.W.2d 395 (Iowa 1969) (Iowa court recognized the plaintiff accountants could not collect their fee if their negligent performance made their audit valueless, but refused to hold the audit was valueless when the trial court found for the plaintiffs); *Allen County Comm'rs v. Baker,* 152 Kan. 164, 102 P.2d 1006 (1940) (Kansas court held the gross inaccuracies in the audit of three offices rendered the audit worthless as a matter of law and allowed recovery of the entire fee paid for the audit even though the audit covered other offices); *City of East Grand Forks v. Steele,* 121 Minn. 296, 141 N.W. 181 (1913) (Minnesota court held a city could recover the amount it paid for an audit if the evidence proved that through incompetence or negligence the audit report was in substance misleading and false).

In this case, the evidence would certainly support a finding that the audit reports for 1982, 1983, and 1984 were inaccurate and worthless due to C & L's negligence, but the evidence shows that C & L was also paid fees for nonauditing work. We have not located any evidence supporting a finding that the nonauditing work was worthless.

There is also evidence that WR paid AY for its auditing and accounting services, and the record would support a finding that all or part of these fees were fair and reasonable and were caused by C & L's malpractice. Again had the jury been properly instructed on this issue, an award of all or part of these fees would have been proper.

The record contains evidence sufficient to support a verdict for WR for damages on both of these issues. Therefore, there is sufficient evidence of some damages, and the trial court properly denied C & L's motion for a directed verdict.

## CONCLUSION

In summary, we have concluded that the evidence and the law support the jury verdict in favor of WR against C & L on the issue of liability. We have also concluded that there was sufficient evidence of damages for expenses as outlined and thus to support a verdict, but insufficient evidence to support an award based on lost profits or for an award measured by a decrease in the value of WR. The verdicts $10,300 for 1982, $12,000 for 1983, and $17,018,000 for 1984 appear, at first blush, to be divisible with the $10,300, the $12,000, and the $18,000 being attributed to fees paid to C & L, and the $17 million to the valuation damages testified to by Shahon. However, the $17 million is more than Shahon's testimony would support, even if Shahon's opinion were otherwise acceptable and the jury had been properly instructed. The jury was not properly instructed upon the correct measure of damages under any theory, even on the fees and expenses WR incurred. Accordingly, we affirm the jury verdict on the issue of liability only and otherwise reverse the judgment and remand the cause for a new trial on the issue of damages in accordance with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR A NEW TRIAL ON THE ISSUE OF DAMAGES.